1 NANCY HOFFMEIER ZAMORA (State Bar No. 137326)
U.S. Bank Tower
2 633 West 5th Street, Suite 2600
Los Angeles, California   90071
3 (213) 488-9411   FAX:  (213) 488-9418
e-mail:  zamora3@aol.com
4
Chapter 7 Trustee
5

6                   UNITED STATES BANKRUPTCY COURT

7                   CENTRAL DISTRICT OF CALIFORNIA

8                   SAN FERNANDO VALLEY DIVISION

9 In re                              )   Case No. 1:14-bk-10982-MT
                                     )
10 FAY ABDI SAGATI                   )   Chapter 7
   aka FOROUGH ABDI SAGATI,          )
11                                   )   MOTION FOR ORDER
              Debtor.                )   AUTHORIZING TRUSTEE TO
12                                   )   SELL REAL PROPERTY FREE
                                     )   AND CLEAR OF LIENS;
13                                   )   MEMORANDUM OF POINTS AND
                                     )   AUTHORITIES; DECLARATION
14                                   )   OF NANCY HOFFMEIER ZAMORA
                                     )
15                                   )   [FILED CONCURRENTLY WITH
                                     )   NOTICE OF MOTION FOR ORDER
16                                   )   AUTHORIZING TRUSTEE TO
                                     )   SELL REAL PROPERTY FREE
17                                   )   AND CLEAR OF LIENS]
                                     )
18                                   )   DATE:  August 20, 2014
                                     )   TIME:  11:00 a.m.
19 _____ )   CTRM:  302

20       Nancy Hoffmeier Zamora, Chapter 7 Trustee ("Trustee") of the

21 bankruptcy estate (the "Estate") in the above-captioned chapter 7

22 bankruptcy case (the "Case") of debtor Fay Abdi Sagati aka

23 Forough Abdi Sagati aka Fay Sagati ("Debtor") hereby respectfully

24 moves the Court for an order approving sale of that certain

25 residential real property, commonly known as 21641 Pacific Coast

26 Highway, Malibu, California 90265, identified as Los Angeles

27 County Assessor's Parcel Number 4451-017-027, with the following

28 legal description:

"Lots 109 and 110 of Tract No. 10570, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in book 161 pages 36 to 42 inclusive, of maps, in the Office of the County Recorder of said county.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deed recorded in book 19246, page 278, official records."

(the "Real Property") free and clear of any interests and liens pursuant to 11 U.S.C. §§ 363(b), (f) and (m), and on an "AS-IS, WHERE-IS" basis, to Vahid Osman, M.D. ("Buyer") for a sales price of $1,610,000.00 (the "Sales Price") through escrow for sale of the Real Property (the "Sale Escrow") and on the other terms and conditions set forth in that certain Purchase and Sale Agreement and Escrow Instructions with Short Sale Addendum and related addenda dated as of July 14, 2014 (collectively, the "Agreement") and in the short sale approval correspondence from PennyMac Loan Services, LLC ("PennyMac") dated July 23, 2014 (the "Short Sale Approval").

True and correct copies of the Agreement and the Short Sale Approval are attached as Exhibit A to the Declaration of Nancy Hoffmeier Zamora (the "Declaration") attached hereto and incorporated herein by reference.

Trustee also moves for approval and authorization to:

(a) execute any and all documents necessary to transfer the Real Property from the Estate to Buyer;

(b) pay the debt secured by the deed of trust (the "Trust Deed"), recorded on August 8, 2006 as instrument no. 06-1755274 of Official Records, for the benefit of PennyMac in the payoff amount of $1,500,000.00 (the "PennyMac Payoff") based on the

Short Sale Approval, the debt secured by the abstract of judgment (the "Judgment Lien"), recorded on July 13, 2010 as instrument no. 20100955716 in Official Records, for the benefit of Colonial Pacific Leasing Corporation ("Colonial") in the reduced amount of $10,000.00 (the "Colonial Payoff") based on the Short Sale Approval and Colonial's consent, association fees and transfer fees of $7,761.53 (the "HOA Fees") to Malibu La Costa Owners Association (the "HOA"), real property taxes of approximately $5,134.79 (the "Property Taxes"), the reduced broker's commission of 3% of the Sales Price, i.e. $48,300.00 (the "Broker Commission"), certain other charges including City and County transfer taxes, escrow fees, and title fees of approximately $8,873.50 authorized by PennyMac in the Short Sale Approval (the "Other Closing Costs");

(c) credit Buyer for tenant's security deposit and last month's rent deposit of $9,600.00 (the "Tenant Deposit"); and

(d) disburse the carve-out of $20,330.18 for the Estate approved by the Short Sale Approval (the "Estate Distribution"), all through the Sale Escrow at Encore Escrow Company, Inc. ("Encore").

Progressive Title Company ("Progressive") prepared a preliminary title report, order no. PR1480430, dated as of March 20, 2014 (the "PTR") that contains recording information regarding the Trust Deed, the Judgment Lien, and that certain financing statement, recorded on June 22, 2006 as instrument no. 06-1374876 in the Official Records, and related continuation statement, recorded on January 4, 2011 as instrument no. 20110009860 in the Official Records (collectively, the "Financing

1  Statement").   Trustee disputes the Financing Statement as a lien

2  against the Real Property.   Based on communications with

3  representatives of Wells Fargo Bank ("Wells"), Trustee expects

4  Wells to release or reconvey the disputed lien prior to the

5  hearing on this motion (the "Motion").   In any event, there is a

6  bona fide dispute regarding the validity of any purported lien

7  based on the Financing Statement and, as such, the Motion

8  provides for sale of the Real Property free and clear of all

9  interests and liens.

10  Further, Trustee requests that the Court's order (the "Sale

11  Order") include a finding that Buyer is a "good faith purchaser"

12  pursuant to Bankruptcy Code §363(m).

13  The Motion is based on the notice of motion (the "Notice")

14  filed with this Court and served on Debtor, Debtor's counsel,

15  Debtor's spouse, the United States Trustee, all creditors, and

16  other interested parties, and on the memorandum of points and

17  authorities and the Declaration, including exhibits, attached

18  hereto.

19  DATED: July 24, 2014

20

21  Nancy Hoffmeier Zamora

22  Chapter 7 Trustee

23

24

25

26

27

28

Sagati/21641 sale motion.001                    4.

**MEMORANDUM OF POINTS AND AUTHORITIES**

This Memorandum of Points and Authorities is submitted in support of the Motion to Sell Real Property Free and Clear of Liens (the "Motion") to which it is attached.  The capitalized terms have the meanings ascribed to them in the Motion unless otherwise defined herein.

## I.  FACTS

1.   On February 26, 2014 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code commencing the Case.  Trustee is the duly appointed Chapter 7 Trustee for the Estate in this Case.

2.   One of the primary assets of the Estate is the Real Property.

3.   The Real Property currently is occupied by tenants Erik D. Margerum and Annestasia Rivard and their children (collectively "Tenant").  Tenant is leasing the Real Property pursuant to a written lease extension through December 31, 2014 that provides for current monthly rent of $5,200.00 (the "Lease Extension").  Tenant's initial lease, prior to the Lease Extension, provided for a security deposit of $4,800.00 and a last month's rent deposit of $4,800.00 for the aggregate amount of $9,600.00 tendered to Debtor as the Tenant Deposit.  Trustee has made multiple demands on Debtor for turnover of the Tenant Deposit that is property of the Estate.  Debtor refused.

4.   On May 12, 2014, the Court entered that certain Order Approving Trustee's Employment of Real Estate Broker (the "Employment Order") [docket no. 56] that approved Trustee's employment of Rodeo Realty, Inc. ("Rodeo") as real estate broker

for the Estate to market and sell the Real Property as of April 7, 2014. Rodeo actively marketed the Real Property for sale as of April 7, 2014 and listed the Real Property on the multiple listing service ("MLS") as of April 22, 2014 with an initial listing price of $1,499,000.00. (Rodeo could not activate the MLS listing until Debtor's prior realtor cancelled his MLS listing of the Real Property.) Thereafter, the listing price was increased to $1,700,000.00, and subsequently adjusted to $1,649,000.00. Trustee authorized these listing adjustments based on PennyMac's valuation and payoff requirement. The Employment Order provides for a broker's commission to be calculated based on 6% of the gross sales price for the Real Property. Rodeo is representing both Trustee and Buyer in the proposed sale. Rodeo agreed to accept a reduced commission of 3% of the Sales Price, i.e., $48,300.00. PennyMac approved the Broker Commission in the Short Sale Approval.

5. On May 12, 2014, the Court entered that certain Order Authorizing Operation of Property Pursuant to 11 U.S.C. §721 (the "Operating Order") [docket no. 57] that provides for Trustee to collect rents from Tenant and to pay expenses for the Real Property until the Court approves Trustee's sale of the Real Property. Pursuant to the Operating Order, Trustee collected rents from Tenant for the months of June and July 2014 and intends to collect rents from Tenant for the months of August and September 2014. Pursuant to the Operating Order, Trustee used collected rents to pay expenses of the Real Property and intends to do so until close of the Sale Escrow. Trustee made multiple demands on Debtor for turnover of post-petition rents that are

property of the Estate and that Debtor and/or her spouse collected for the months of March, April, and May 2014.   Debtor refused.

6.   According to the PTR, title to the Real Property is held by Debtor and her spouse, Joseph Sagati ("Joseph"), husband and wife as joint tenants.   Debtor and Joseph have treated the Real Property as community property and have cooperated with Trustee's marketing and sale of the Real Property.   All community property of Debtor and her spouse became property of the Estate on the Petition Date pursuant to 11 U.S.C. §541.   A true and correct copy of the PTR is attached as Exhibit B to the Declaration and incorporated herein by reference.

7.   Rodeo provided Trustee with all requested information necessary to satisfy her that the immediate sale of the Real Property to Buyer is in the best interest of the Estate.   Rodeo informed Trustee regarding all inquiries by real estate agents and potential buyers related to the Real Property and all showings of the Real Property.   There were approximately fifteen (15) inquiries and ten (10) showings.   Rodeo received and presented to Trustee written offers from four (4) potential buyers.   The terms contained in the Agreement, including the Sales Price, represent the highest and best offer Trustee received, and that was not withdrawn, as of the date of the Motion.   Trustee negotiated the Sales Price with Buyer based on current market conditions and requirements necessary to obtain the Short Sale Approval.

8.   Based on the total debt owed to PennyMac and secured by the Trust Deed, Trustee had to obtain approval from PennyMac for

a short sale of the Real Property and to provide consent for the

Estate Distribution.  On July 23, 2014, Trustee received the

Short Sale Approval.  In the Short Sale Approval, PennyMac

consented to the Estate Distribution of $20,330.18 to be

disbursed to Trustee on behalf of the Estate from the Sales Price

through the Sale Escrow.

9.    Trustee has no relationship to or with Buyer except

that at or about the time Buyer made his offer for the Real

Property, Buyer also made an offer for another real property in

an unrelated chapter 7 bankruptcy case of debtor Adrian Gunnar

Williams, case no. 1:13-bk-15495-MT (the "Williams Case"), for

which Trustee is the chapter 7 trustee.  Trustee has opened a

sale escrow with Buyer at Encore for the real property in the

Williams Case.  Trustee's counsel in the Williams Case is

preparing a sale motion, subject to overbid, for the Court's

approval to sell the real property to Buyer in the Williams Case.

Trustee has reviewed Debtor's schedules and the claims register

and claims filed in the Case. Based on this review, Trustee has

determined that Buyer is not a creditor of the Estate.  Trustee

believes that Buyer is a good faith purchaser.  Trustee

negotiated at "arm's-length" with Buyer.

10.    Trustee and Buyer opened the Sale Escrow with Encore.

Encore prepared the estimated closing statement and a draft HUD-1

(collectively, the "Estimated Closing Statement") based on

information in the PTR and the Short Sale Approval.  A true and

correct copy of the Estimated Closing Statement is attached as

Exhibit C to the Declaration and incorporated herein by

reference.

11.  As described herein and in the exhibits attached to the Declaration, the Sales Price ($1,610,000.00) equals:

a.  the PennyMac Payoff of $1,500,000.00 secured by the Trust Deed;

b.  the Colonial Payoff of $10,000.00 secured by the Judgment Lien

c.  the Property Taxes of approximately $5,134.79;

d.  the HOA Fees of $7,761.53;

e.  the reduced Broker Commission of $48,300.00;

f.  the Other Closing Costs of approximately $8,873.50;

g.  the Tenant Deposit of $9,600.00 to be credited to Buyer; and

h.  the Estate Distribution of $20,330.18 to be paid to Trustee on behalf of the Estate and for which PennyMac has provided its consent in the Short Sale Approval.

12.  The PTR includes exception number 9 that refers to the Financing Statement.  Trustee disputes the validity and effectiveness of any lien purported to be created by the Financing Statement as the debtor named in the Financing Statement is Southwest Engineering, Inc., a company that does not hold, and has not held, title to the Real Property.  Trustee communicated with Wells regarding the Financing Statement and the dispute over any purported lien.  Trustee is informed and believes that Wells is investigating the Financing Statement and expects that, prior to the hearing on the Motion, Wells will provide a document that can be recorded to release or reconvey any possible lien purported to be created by the recording of the Financing Statement.

13.   The Motion seeks approval and authorization for Trustee (a) to execute any and all documents necessary to transfer the Real Property from the Estate to Buyer, (b) to pay the debt secured by the PennyMac Payoff, the Colonial Payoff, the HOA Fees, the Property Taxes, the Broker Commission, and the Other Closing Costs through the Sale Escrow, (c) to credit Buyer the Tenant Deposit, and (d) to disburse the Estate Distribution to Trustee on behalf of the Estate, all through the Sale Escrow at Encore.

14.   Trustee desires to maximize distributions to creditors of the Estate by selling the Real Property free and clear of liens and on an "AS-IS, WHERE-IS" basis to Buyer for the Sales Price of $1,610,000.00 and pursuant to the other terms set forth in the Agreement and the Short Sale Approval.

## II.   ARGUMENT

A.   The Court Has Authority to Approve the Sale of the Real
     Property Free and Clear of Liens Pursuant to 11 U.S.C.
     §§ 363(b) and (f).

Generally, Trustee relies on 11 U.S.C. §363(b) in proposing to sell the Real Property outside the ordinary course of business after notice and the opportunity for a hearing. 11 U.S.C. §363(b) provides that:

> [t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

In addition, Trustee relies on 11 U.S.C. §363(f) in proposing to sell the Real Property  free and clear of any interests and liens.  11 U.S.C. §363(f) provides that:

[t]he trustee may sell property. . . free and clear of any interest in such property of an entity other than the estate, only if −. . .

   (1)   applicable nonbankruptcy law permits sale of such property free and clear of such interest;. . .

   (2)   such entity consents;. . .

   (3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

   (4)   such interest is in bona fide dispute; or

   (5)   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Debtor was holder of title of the Real Property as community property with Joseph, Debtor's spouse, as of the Petition Date. Pursuant to 11 U.S.C. §541(a)(2), all interest of Debtor and Debtor's spouse in community property as of the Petition Date is property of the Estate.

11 U.S.C. §363(f) authorizes Trustee to sell the property of a chapter 7 bankruptcy estate free and clear of any interest held by an entity other than a debtor's estate if such interest is a lien and the price at which the property is to be sold is greater than the aggregate value of all liens on the property or if such entity holding the lien consents or if the lien is in bona fide dispute.

In the instant case, Trustee proposes to sell the Real Property for the Sales Price of $1,610,000.00. If approved by the Court, proceeds from the sale as proposed by Trustee will provide sufficient funds to pay off all undisputed liens recorded against the Real Property in such amounts as the lienholders have agreed to accept. Specifically, the PennyMac Payoff will be paid in satisfaction of the debt secured by the Trust Deed; the

Colonial Payoff will be paid in satisfaction of the Judgment Lien as to the Real Property (the Judgment Lien remains effective against other real property of the Estate in the Case), and the amounts owed to the County of Los Angeles for the real property tax liens will be paid.  Encore assisted Trustee by preparing the Estimated Closing Statement that illustrates the proposed distributions from Escrow, including the disbursements to pay these liens either in full or in the reduced amounts to which PennyMac and Colonial, respectively, have consented.

Regarding the Financing Statement, any purported lien for the benefit of Wells is in bona fide dispute.  Trustee notified Wells that Trustee disputes the Financing Statement as a lien against the Real Property.  Based on communications with representatives of Wells, Trustee is informed and believes that Wells will provide a document that will release or reconvey the disputed lien prior to the hearing on this Motion.

B.    Sale of the Real Property Free and Clear of Liens is in the
      Best Interest of Creditors of the Estate.

Sale of the Real Property pursuant to the terms of the Agreement is in the best interest of creditors with claims against the Estate for the following reasons:

1.    The Real Property is one of the primary assets of the Estate.  Sale of the Real Property will minimize administrative expenses to the Estate by resolving the Estate's administration in a speedy and cost-efficient manner for the benefit of all secured lienholders and other creditors of the Estate.

2.    Sale of the Real Property will eliminate the risk and uncertainty of future fluctuations in the real estate market.

3.    Sale of the Real Property pursuant to the terms of the Agreement is in the best interest of the unsecured creditors of the Estate because the Estate Distribution of $20,330.18 will be available for distribution to creditors.

C.    <u>Trustee May Sell Property of the Estate Without Overbid Procedures.</u>

Other courts have held that overbids are not required with respect to bankruptcy sales.  <u>See e.g.</u>, <u>In re Bakalis</u>, 200 B.R. 525 (Bankr. E.D.N.Y. 1998); <u>In re Blue Coal Corp.</u>, 168 B.R. 553 (Bankr. Pa. 1994); <u>In re Blue Coal Corp.</u>, 67 B.R. 798 (Bankr. Pa. 1986); and <u>In re Blue Coal Corp.</u>, 168 B.R. at 564, quoting 4B <u>Collier on Bankruptcy</u>.  In this Case, Trustee is not proposing an overbid procedure because of the nature of the short sale process.  The Short Sale Approval is specific to Buyer.  Further, the Short Sale Approval requires tender of the PennyMac Payoff before September 30, 2014.

D.    <u>Notice of the Sale is Adequate.</u>

Trustee is serving notice of the sale on Debtor, Debtor's counsel, Debtor's spouse and her bankruptcy counsel, the Office of the United States Trustee, all creditors, and all other interested parties.

E.    <u>Buyer Should Be Deemed a "Good Faith Purchaser" Pursuant to 11 U.S.C. § 363(m).</u>

11 U.S.C. § 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such

authorization and such sale or lease were stayed pending appeal.

A good faith buyer "is one who buys 'in good faith' and 'for value.'" Ewell v. Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir. 1992) (citing In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986)). "[L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" Id. (quoting Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir. 1985)).

In the instant case, Buyer is buying in good faith, and has not colluded with the Trustee or anyone else regarding the subject sale. The anticipated sale of the Real Property has been negotiated with the Buyer in "arm's-length" discussions. Trustee is informed and believes that Rodeo actively marketed the Real Property by listing the Real Property on the multiple listing service and through other commercially reasonable means of selling residential real property. Rodeo has informed Trustee of all showings of the Real Property, all potential buyers, and all written offers. Buyer's offer was the highest and best written offer Trustee has received, and that has not been withdrawn, as of the date of the Motion. Based on such facts and circumstances, this Court can properly determine the Buyer as a "good faith purchaser" pursuant to 11 U.S.C. § 363(m).

### III.    CONCLUSION

**WHEREFORE,** Trustee requests that the Court enter an order providing that:

1    A.    The Motion is approved in its entirety;

2    B.    Trustee is authorized to execute any and all documents,

3    including, but not limited to, the Agreement, escrow

4    instructions, and a quit claim deed on behalf of the Estate,

5    necessary to sell and transfer the Real Property to Buyer, free

6    and clear of all liens and interests, for the Sales Price, and

7    pursuant to the terms and conditions set forth in the Agreement

8    and the Short Sale Approval;

9    C.    Trustee is authorized to pay the PennyMac Payoff

10   secured by the Trust Deed, the Colonial Payoff secured by the

11   Judgment Lien, the HOA Fees, the Property Taxes, the Broker

12   Commission, the Other Closing Costs, and the Estate Distribution

13   and to credit buyer for the Tenant Deposit, all through the Sale

14   Escrow at Encore;

15   D.    Buyer is entitled to the protections of § 363(m) of the

16   Bankruptcy Code;

17   E.    Notice of the Motion and of the sale is proper and

18   adequate;

19   F.    The stay of the order approving this Motion imposed by

20   Federal Rule of Bankruptcy Procedure 6004(h) and any other

21   applicable bankruptcy rules is waived; and

22   G.    Such other and further relief as the Court may deem

23   just and appropriate.

24   DATED: July 24, 2014

25   Nancy Hoffmeier Zamora,

26   Chapter 7 Trustee

27

28

## DECLARATION OF NANCY HOFFMEIER ZAMORA

I, Nancy Hoffmeier Zamora, declare:

1.    I am the duly appointed, qualified and acting Chapter 7 Bankruptcy Trustee of the above-entitled case.  If called upon as a witness I could and would competently testify to the matters stated herein.

2.    All capitalized terms used in this declaration have the meanings ascribed to them in the foregoing Motion to Sell Real Property Free and Clear of Liens (the "Motion") and the Memorandum of Points and Authorities in support of the Motion unless otherwise defined herein.

3.    On the Petition Date, Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code commencing the Case. I then was duly appointed as Chapter 7 Trustee for the Estate in this Case.

4.    One of the primary assets of the Estate is the Real Property.

5.    The Real Property currently is occupied by Tenant. Tenant is leasing the Real Property pursuant to the Lease Extension.  Tenant's initial lease, prior to the Lease Extension, provided for a security deposit of $4,800.00 and a last month's rent deposit of $4,800.00 for the aggregate amount of $9,600.00 tendered to Debtor as the Tenant Deposit.  I have made multiple demands on Debtor for turnover of the Tenant Deposit that is property of the Estate, but Debtor has refused.

6.    On May 12, 2014, the Court entered the Employment Order [docket no. 56] that approved my employment of Rodeo as real estate broker for the Estate to market and sell the Real Property

as of April 7, 2014.  Rodeo actively marketed the Real Property for sale as of April 7, 2014 and listed the Real Property on the MLS as of April 22, 2014 with an initial listing price of $1,499,000.00.  (Rodeo could not activate the MLS listing until Debtor's prior realtor cancelled his MLS listing of the Real Property.)  Thereafter, the listing price was increased to $1,700,000.00, and subsequently adjusted to $1,649,000.00.  I authorized these listing adjustments based on PennyMac's valuation and payoff requirement.  The Employment Order provides for a broker's commission to be calculated based on 6% of the gross sales price for the Real Property.  Rodeo is representing both Buyer and me, as seller, in the proposed sale.  Rodeo agreed to accept a reduced commission of 3% of the Sales Price, i.e., $48,300.00.  PennyMac approved the Broker Commission in the Short Sale Approval.

7.   On May 12, 2014, the Court entered the Operating Order [docket no. 57] that provides for me to collect rents from Tenant and to pay expenses for the Real Property until the Court approves my sale of the Real Property.  Pursuant to the Operating Order, I collected rents from Tenant for the months of June and July 2014 and I intend to collect rents from Tenant for the months of August and September 2014.  Pursuant to the Operating Order, I used collected rents to pay expenses of the Real Property and I intend do so until close of the Sale Escrow.  I made multiple demands on Debtor for turnover of post-petition rents that are property of the Estate and that Debtor and/or her spouse collected for the months of March, April and May 2014, but Debtor has refused.

8.    According to the PTR, title to the Real Property is held by Debtor and her spouse, Joseph, husband and wife as joint tenants.    Debtor and Joseph have treated the Real Property as community property and have cooperated with my marketing and sale of the Real Property.    All community property of Debtor and her spouse became property of the Estate on the Petition Date pursuant to 11 U.S.C. §541

9.    Rodeo provided me with all requested information necessary to satisfy me that the immediate sale of the Real Property to Buyer is in the best interest of the Estate. Rodeo informed me regarding all inquiries by real estate agents and potential buyers related to the Real Property and all showings of the Real Property.    There were approximately fifteen (15) inquiries and ten (10) showings.    Rodeo received and presented to me written offers from four (4) potential buyers. The terms contained in the Agreement represent the highest and best offer I received, and that was not withdrawn, as of the date of the Motion.

10.    The Sales Price offered by Buyer in the Agreement is the highest and best offer I received, and that was not withdrawn, as of the date of the Motion.    I negotiated the Sales Price with Buyer based on current market conditions and requirements necessary to obtain the Short Sale Approval.    Rodeo actively marketed the Real Property since April 7, 2014, including listing of the Real Property on the MLS since April 22, 2014 and multiple showings of the Real Property to agents and potential buyers.    Based on the total debt owed to PennyMac and secured by the Trust Deed, I had to obtain approval from PennyMac

for a short sale of the Real Property and to provide consent for the Estate Distribution.  On July 23, 2014, I received the Short Sale Approval.  In the Short Sale Approval, PennyMac consented to the Estate Distribution of $20,330.18 to be disbursed to me, on behalf of the Estate, from the Sales Price through the Sale Escrow.

11.    I have no relationship to or with Buyer except that at or about the time Buyer made his offer for the Real Property, Buyer also made an offer for another real property in the Williams Case in which I am the chapter 7 trustee.  I opened a sale escrow with Buyer at Encore for the real property in the Williams Case.  My counsel in the Williams Case is preparing a sale motion, subject to overbid, for the Court's approval to sell the real property to Buyer in the Williams Case.  I reviewed Debtor's schedules and the claims register and claims filed in the Case. Based on this review, I determined that Buyer is not a creditor of the Estate.  I believe that Buyer is a good faith purchaser.  I negotiated at "arm's-length" with Buyer.

12.    Buyer and I opened the Sale Escrow with Encore. Encore prepared the  Estimated Closing Statement based on information in the PTR and the Short Sale Approval.

13.    As described in the Motion, this declaration, and the exhibits attached to this declaration, the Sales Price ($1,610,000.00) equals:

a.    the PennyMac Payoff of $1,500,000.00 secured by the Trust Deed;

b.    the Colonial Payoff of $10,000.00 secured by the Judgment Lien

c.     the Property Taxes of approximately $5,134.79;

d.     the HOA Fees of $7,761.53;

e.     the reduced Broker Commission of $48,300.00;

f.     the Other Closing Costs of approximately $8,873.50;

g.     the Tenant Deposit of $9,600.00 to be credited to Buyer; and

h.     the Estate Distribution of $20,330.18 to be paid to Trustee on behalf of the Estate and for which PennyMac has provided its consent in the Short Sale Approval.

14.    The PTR includes exception number 9 that refers to the Financing Statement.  I dispute the validity and effectiveness of any lien purported to be created by the Financing Statement as the debtor named in the Financing Statement is Southwest Engineering, Inc., a company that does not hold, and has not held, title to the Real Property.  I communicated with Wells regarding the Financing Statement and the dispute over any possible lien.  I am informed and believe that Wells is investigating the Financing Statement and I expect that, prior to the hearing on the Motion, Wells will provide a document that can be recorded to release or reconvey any possible lien purported to be created by the recording of the Financing Statement.

15.    The Motion seeks approval and authorization for me (a) to execute any and all documents necessary to transfer the Real Property from the Estate to Buyer, (b) to pay the debt secured by the PennyMac Payoff, the Colonial Payoff, the HOA Fees, the Property Taxes, the Broker Commission, and the Other Closing Costs through the Sale Escrow, (c) to credit Buyer the Tenant Deposit, and (d) to disburse the Estate Distribution to Trustee

1  on behalf of the Estate, all through the Sale Escrow at Encore.

2      16.  I desire to maximize distributions to creditors of the

3  Estate by selling the Real Property free and clear of liens and

4  on an "AS-IS, WHERE-IS" basis to Buyer for the Sales Price of

5  $1,610,000.00 and pursuant to the other terms set forth in the

6  Agreement and the Short Sale Approval.

7      17.  True and correct copies of the Agreement and the Short

8  Sale Approval are attached as Exhibit A to this declaration and

9  incorporated herein by reference.

10     18.  A true and correct copy of the PTR is attached as

11  Exhibit B to this declaration and incorporated herein by

12  reference.

13     19.  A true and correct copy of the Estimated Closing

14  Statement is attached as Exhibit C to this declaration and

15  incorporated herein by reference.

16     I declare under penalty of perjury that the foregoing is

17  true and correct.  Executed this 24th day of July, 2014, at Los

18  Angeles, California.

19

20                                    NANCY HOFFMEIER ZAMORA

21

22

23

24

25

26

27

28

# EXHIBIT  A

PURCHASE AND SALE AGREEMENT AND ESCROW INSTRUCTIONS
(RESIDENTIAL PROPERTY)

This purchase and sale agreement and escrow instructions (the "Agreement") is entered into as of July 14, 2014 (the "Execution Date") by and between Vahid  Osman, M.D. ("Buyer") and Nancy Hoffmeier Zamora ("Trustee") in her capacity as chapter 7 trustee for the bankruptcy estate (the "Estate") of Fay Abdi Sagati. Together, Buyer and Trustee hereinafter shall be referred to as the "Parties."

## RECITALS

A.    That certain residential real property (the "Real Property") commonly known as 21641 Pacific Coast Highway, Malibu, California 90265 and identified as Los Angeles County Assessor's Parcel No. 4451-017-027 is an asset of the Estate.

B.    Trustee is the duly appointed chapter 7 trustee for the Estate.

C.    Subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court"), Section 363(f) of the United States Bankruptcy Code authorizes Trustee to sell the Real Property free and clear of any interests and liens pursuant to the Agreement.

D.    Article 1.5 ("Article 1.5") of the California Civil Code ("Civil Code") requires disclosures by sellers upon the transfer of residential real property (Civil Code section 1102 et seq.). Civil Code section 1102.2 of the Civil Code exempts Trustee from the provisions of Article 1.5.

## AGREEMENT

In consideration of the mutual covenants and agreements reflected herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties to this Agreement agree as follows:

1.    **Purchase of the Real Property**.  Buyer shall purchase the Real Property from the Estate for a total sales price of $1,610,000.00 (the "Purchase Price") payable in cash upon Close of Escrow (as defined below in Paragraph 6).

2.    **Purchase of Personal Property**.  The Purchase Price shall include Buyer's purchase of all existing fixtures and fittings (the "Personal Property") attached to the Real Property free and clear of liens and without Trustee's warranty.    Buyer acknowledges that prior and current occupants of the Real Property may have caused waste to the Real Property by, among other things, removing various fixtures and fittings from the Real Property.

3.    **As-Is; Where-Is**.  Buyer agrees to purchase the Real Property and the Personal Property on an "as-is, where-is" basis. Buyer acknowledges that Trustee made no investigation of nor makes any representation or warranty regarding the condition of the Real Property or the Personal Property.

4.    **Earnest Money Deposit**.

a.    **Escrow Account**. Buyer shall deposit $40,000.00 (the "Earnest Money") with Escrow Holder (as defined below in Paragraph 6) on or before July 15, 2014.  The Earnest Money shall be in the form of a cashier's check made payable to Escrow Holder. Escrow Holder shall apply the Earnest Money to the Purchase Price upon Close of Escrow.

b.    **Refund of the Earnest Money**.  Trustee shall authorize Escrow Holder to refund the Earnest Money to Buyer if the Parties cancel Escrow pursuant to Paragraph(s) 5, 8, 9, 15 and/or 16 (as provided below in Paragraph 6(g)(2)).

c.    **Surrender of the Earnest Money**.  As provided below in Paragraph 17, Buyer shall surrender the Earnest Money to Trustee as liquidated damages if the Bankruptcy Court approves Buyer's purchase of the Real Property, then Buyer defaults under this Agreement.

Sagati/Osman

Trustee

V.O.
Buyer
Page 1 of 9

5.  Motion for Order Approving Sale of Real Property.

a.  **Buyer Acknowledgment.**. Buyer acknowledges that sale of the Real Property pursuant to this Agreement is subject to prior approval by the Bankruptcy Court and prior short sale approval (the "Short Sale Approval") by the current holder of the trust deed secured by the Real Property (the "Lender"). As such, the Bankruptcy Court's approval of this Agreement and the Lender's Short Sale Approval are contingencies of sale.

b.  **Short Sale Addendum.** Trustee and Buyer attach and incorporate herein the Short Sale Addendum dated July 14, 2014.

c.  **Sale Motion and Hearing.**

(1)  **Motion.** After the Parties execute this Agreement, Trustee shall file with the Bankruptcy Court a motion (the "Sale Motion") for order approving sale of the Real Property free and clear of any interests and liens, and a notice of hearing (the "Sale Hearing") on the Sale Motion. Trustee shall attach this Agreement as an exhibit to the Sale Motion.

(2)  **Order.** At the conclusion of the Sale Hearing, Trustee shall lodge a proposed order with the Court approving sale of the Real Property to Buyer pursuant to this Agreement approved by the Bankruptcy Court at the Sale Hearing. Upon the Bankruptcy Court's entry of the order approving Trustee's sale of the Real Property to Buyer pursuant to this Agreement (the "Sale Order"), Trustee shall deposit a certified copy of the Sale Order into Escrow.

(3)  **Buyer Not Approved.** If the Bankruptcy Court does not approve Buyer to purchase the Real Property, the Parties shall cancel Escrow and Trustee shall authorize Escrow Holder to refund the Earnest Money to Buyer.

6.  Escrow.

a.  **Opening Escrow.** This sale shall be consummated through an escrow ("Escrow") established with Encore Escrow ("Escrow Holder"), located at 23901 Calabasas Road, #1033 , Calabasas, California, 91302.   On   July 15, 2014, the Parties shall deposit this Agreement with Escrow Holder, which deposit shall open Escrow for sale of the Real Property.

b.  **Earnest Money.** Upon receipt of the Earnest Money, Escrow Holder shall deposit the Earnest Money into an escrow account established exclusively for the purpose of selling the Real Property.

c.  **Joint Escrow Instructions to Escrow Holder.** The applicable portions of this Agreement shall constitute joint escrow instructions (the "Joint Escrow Instructions") of Trustee and Buyer to Escrow Holder.

d.  **Supplemental Escrow Instructions.** The Joint Escrow Instructions may be modified and/or supplemented pursuant to addenda executed by the Parties. Trustee and Buyer acknowledge that Escrow Holder will ask the Parties to execute general escrow provisions (the "Supplemental Escrow Instructions") that control the duties and obligations of Escrow Holder only. To the extent the Supplemental Escrow Instructions conflict with this Agreement or the Joint Escrow Instructions, this Agreement and the Joint Escrow Instructions, not the Supplemental Escrow Instructions, shall control the rights, duties, and obligations of the Parties.

e.  **Closing Date.** Close of Escrow shall occur on the first business day that is at least fifteen (15) days after entry of the Sale Order (the "Closing Date"). The Parties can accelerate or extend the Closing Date by executing an amendment to this Agreement that provides for an earlier or later Closing Date that is consistent with the Sale Order.

f.  **Close of Escrow.** "Close of Escrow" shall occur when Escrow Holder records the Quitclaim Deed (as defined below in Paragraph 15) transferring fee title to the Real Property from the Estate to Buyer.

. . . . .
. . . . .

g.    **Cancellation of Escrow.**

(1)    **Buyer Default.** If Close of Escrow does not occur by the Closing Date because Buyer defaults on Buyer's obligations pursuant to this Agreement, Buyer agrees to forfeit the Earnest Money to Trustee and the Estate as provided below in Paragraph 17.

(2)    **Cancellation Pursuant to Contingency.** If Buyer cancels Escrow pursuant to Paragraph(s) 5, 8, 9, 15 and/or 16 of this Agreement, the Parties shall cancel Escrow and Trustee shall authorize Escrow Holder to refund the Earnest Money to Buyer.

(3)    **No Prejudice.** Cancellation of Escrow as provided herein shall be without prejudice to whatever legal rights Trustee and Buyer may have against each other.

h.    **Preliminary Closing Statements.** No less than five (5) business days prior to Close of Escrow, Escrow Holder shall provide Trustee with preliminary closing statements (the "Preliminary Closing Statements") for both Trustee as seller of the Real Property and Buyer as purchaser of the Real Property.

i.    **Closing Documents.** No less than five (5) business days prior to Close of Escrow, Escrow Holder shall provide the Parties with any and all documents that the Parties must execute and deposit with Escrow Holder prior to Close of Escrow.

7.    **Balance of Purchase Price.** Buyer shall deposit the balance of the Purchase Price (the "Purchase Price Balance"), i.e., $1,570,000.00, into Escrow in the form of cash or by wire transfer at least one (1) business day before the Closing Date or by cashier's check during business hours at least two (2) business days before the Closing Date. After paying all approved costs and liens consistent with the Sale Order and the Short Sale Approval, Escrow Holder shall pay from the Purchase Price Balance to Trustee, on behalf of the Estate, such amount as is allowed by the Short Sale Approval and the Sale Order, by check made payable to "Nancy Hoffmeier Zamora, Chapter 7 Trustee, Sagati Estate."

8.    **Inspection Contingency.** Buyer may cancel Escrow on or before the tenth day after receipt of the written Short Sale Approval from Lender (the "Contingency Deadline") based on Buyer's inspection of the Real Property.  Buyer shall notify Trustee in writing that Buyer is canceling Escrow based on Buyer's inspection of the Real Property and Buyer's ability to obtain a homeowner's insurance policy for the Real Property. If Buyer cancels Escrow pursuant to this inspection contingency, the Parties shall cancel Escrow and Trustee shall authorize Escrow Holder to refund the Earnest Money to Buyer.

9.    **Loan Contingency.**

a.    **Buyer Representation.** Buyer represents that Buyer has pre-approval for a loan to complete the purchase of the Real Property. Buyer may cancel Escrow by the Contingency Deadline if Buyer does not obtain the final approval necessary for such loan.

b.    **Close of Escrow.** Buyer agrees to deposit funds equal to the Purchase Price Balance and Buyer's closing costs by the Closing Date as provided in Paragraph 7.

10.    **Closing and Possession.**

a.    **Delivery.** Buyer agrees to accept transfer of the Real Property from Trustee on the Closing Date subject to the possession and occupancy by current tenants who have agreed to pay monthly rent of $5,200.00 through December 31, 2014, less a security deposit and last month's rent that total $9,600.00 (the "Tenants' Deposit"). Trustee will provide to Buyer, through Escrow, copies of all lease and rental documents Trustee has in her possession. Trustee makes no representations regarding the accuracy of any information in the lease and rental documents. Trustee will credit Buyer the Tenants' Deposit but there will be no pro-rating of rent for the month in which the Close of Escrow occurs.

. . . . .
. . . . .
. . . . .

Trustee                    Buyer
                                                    Page 3 of 9

b.      **Assignable Warranty Rights**. Upon Close of Escrow, to the extent permitted by law and/or contract, Trustee shall hereby assign warranty rights, if any, for the Personal Property.

c.      **Access**. Upon Close of Escrow, Trustee shall provide Buyer all keys and or means to operate all locks, mailboxes, security systems, alarms, and garage door openers that are in Trustee's possession or control, if any.

11.     **Reports and Disclosures**.

a.      **Pest Control**. Trustee shall not pay for or provide Buyer with a pest control report for the Real Property as a condition of sale. Trustee has made no investigation of and makes no representation or warranty regarding the physical condition of the Real Property. Buyer acknowledges that sale of the Real Property is on an "as-is, where-is" basis.

b.      **Natural Hazard Zone Disclosure Report**. Buyer acknowledges that Civil Code section 1103.2(a)(1) specifically exempts transfers of real property by a trustee in bankruptcy. Accordingly, Buyer acknowledges that Trustee shall not pay for or otherwise provide a natural hazard zone disclosure report (the "NHZD Report") for Buyer's review prior to Close of Escrow. If Buyer and/or Title Company (as defined below in Paragraph 15) require a NHZD Report in order to close Escrow, Buyer shall pay for the NHZD Report. Trustee has made no investigation of and makes no representation or warranty regarding the physical condition of the Real Property or the location of the Real Property. Buyer acknowledges that sale of the Real Property is on an "as-is, where-is" basis.

c.      **Data Base Disclosure Addendum (Megan's Law)**. Buyer acknowledges that Civil Code section 2079.10a) (referring to Civil Code section 1102) specifically exempts transfers of real property by a trustee in bankruptcy from the requirements of 2079.10a, commonly referred to as "Megan's Law." Accordingly, Buyer acknowledges that Trustee will not execute a "Data Base Disclosure Addendum (Megan's Law)" as a condition for closing Escrow. Trustee has made no investigation of and makes no representation or warranty regarding the existence or non-existence of convicted sex offenders or other criminals in the neighborhood surrounding the Real Property. Buyer acknowledges that sale of the Real Property is on an "as-is, where-is" basis.

d.      **Real Estate Transfer Disclosure Statement**. Buyer acknowledges that Civil Code section 1102 specifically exempts from the provisions of Article 1.5 transfers of real property by a trustee in bankruptcy. Buyer acknowledges that Article 1.5 requires, among other things, disclosures by sellers upon the sale of residential real property. Accordingly, Buyer acknowledges that Trustee will not provide Buyer with a Real Estate Transfer Disclosure Statement or addenda thereto, including, without limitation, an "Airport Proximity Addendum for Los Angeles County." Trustee has made no investigation and makes no representation or warranty regarding the Real Property, the neighborhood surrounding the Real Property, or the general location of the Real Property. Buyer acknowledges that sale of the Real Property is on an "as-is, where-is" basis.

e.      **Mello-Roos Community Facilities Act**. Trustee has made no investigation and makes no representation or warranty regarding any special taxes assessed against the Real Property by a local agency pursuant to the Mello-Roos Community Facilities Act ("Mello-Roos").

12.     **Prorations of Property Taxes and Other Items**.

a.      **Buyer and Trustee**. The following items shall be paid current and prorated between Buyer and Trustee as of Close of Escrow:

(1)     real property taxes and assessments;

(2)     interest;

(3)     rents;

(4)     municipal utilities;



(5)    payments on bonds and assessments assumed by Buyer, if any;

(6)    payments on Mello-Roos and other special assessment district bonds and assessments, if any, which are now a lien; and

(7)    any and all other items identified by Escrow Holder in the Preliminary Closing Statements and approved by the Parties prior to Close of Escrow.

b.    **Buyer**. Buyer shall be responsible for prorated payments on Mello-Roos and other special assessment district bonds and assessments that are now a lien but not yet due.

c.    **Supplemental Tax Bills**. For periods after Close of Escrow, Buyer shall be responsible for any and all supplemental taxes assessed against the Real Property. For periods prior to Close of Escrow, Trustee shall be responsible for any and all supplemental taxes assessed against the Real Property.

13.    **Additional Buyer Costs**. In addition to costs allocated to Buyer by other provisions of this Agreement, Buyer shall pay for the cost of:

a.    smoke detector installation, carbon monoxide detector installation and/or water heater bracing, if required by law;

b.    compliance with any other minimum mandatory government retrofit standards, inspections and reports if required as a condition of closing Escrow under any law;

c.    fifty percent (50%) of the escrow fees ("Escrow Fees") charged by Escrow Holder;

d.    homeowner's warranty policy; and

e.    the NHZD Report.

14.    **Additional Trustee Costs**. Trustee shall pay for the cost of the following in the amounts and to the extent that the Lender's Short Sale Approval authorizes such payment from the Purchase Price:

a.    county transfer tax or transfer fee;

b.    city transfer tax or transfer fee;

c.    fifty percent (50%) of the Escrow Fees;

d.    title insurance policy; and

e.    Home Owner Association fees including, but not limited to, transfer fee and document preparation fees, if any.

15.    **Title and Vesting**.

a.    **Preliminary Title Report**. As of the Execution Date, Trustee has procured and deposited with Escrow Holder a preliminary title report ("PTR") issued by Progressive Title Company ("Title Company"). Escrow Holder has provided PTR to Buyer for review and approval. Buyer already has approved PTR.

b.    **Quitclaim Deed**. At Close of Escrow, Buyer shall receive a quitclaim deed (the "Quitclaim Deed") transferring title ("Title") to the Real Property from the Estate to Buyer. Unless otherwise designated in Buyer's escrow instructions, title shall vest as follows:  Vahid Osman, M.D. Title shall include oil, mineral and water rights, if any, appurtenant to the Real Property. Title shall be subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters which are of record or are disclosed to Buyer prior to Close of Escrow.

Trustee

Buyer
Page 5 of 9

c.  . . - __Title Insurance__. Trustee shall procure from Title Company a California Land Title Association ("CLTA") standard policy of title insurance in the amount of the Purchase Price to be approved by Buyer, showing title vested in Buyer, as stated above, with only those exceptions to title approved by Buyer on the PTR produced by the Title Company.

d.    __Real Property Insurance__.  Trustee's hazard and casualty insurance on the Real Property shall be canceled as of the Closing Date, and Buyer shall be responsible for obtaining insurance coverage as of the Closing Date.

16.    __Contingency and Cancellation Rights__.  If Buyer removes any contingency or cancellation right as provided herein, Buyer shall conclusively be deemed to have:

a.    completed all inspections, investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right;

b.    elected to proceed with purchasing the Real Property pursuant to this Agreement; and

c.    assumed all liability, responsibility, and expense for repairs or corrections pertaining to that contingency or cancellation right.

17.    __LIQUIDATED DAMAGES__. If Buyer fails to complete the purchase contemplated by this Agreement because of Buyer's default, Trustee shall retain the Earnest Money as liquidated damages and shall be released from any further obligation to sell the Real Property to Buyer. Escrow Holder shall release the Earnest Money to Trustee upon receiving Trustee's written notification that Buyer has defaulted under the terms of this Agreement.

Buyer's Initials _VO_      Trustee's Initials _m_

18.    __Additional Obligations__.

a.    __Withholding Taxes__.  Trustee and Buyer agree to execute and deliver any instrument, affidavit, statement, or instruction reasonably necessary to comply with federal and state tax withholding laws.

b.    __Additional Documents__.  Trustee and Buyer agree to take such further action and execute all such further documents as may be necessary or appropriate in order to consummate this Agreement.

19.    __Broker Compensation__.

a.    __Broker's Fee__.  Subject to approval by the Bankruptcy Court, in consideration of real estate brokerage services rendered, Trustee agrees to pay Rodeo Realty, Inc. ("Estate Broker") upon Close of Escrow, a total real estate brokerage fee equal to three percent (3%) of the Purchase Price.

b.    __Failure to Close Escrow__.  No commission or other fee shall be payable to Estate Broker if Escrow fails to close.  Trustee and Buyer acknowledge that no other broker's commission or finder's fee is payable with regard to this transaction.

c.    __Indemnification__. Trustee and Buyer each ("Indemnitor") agrees to indemnify and hold the other harmless from and against all liability, claims, demands, damages, or costs of any kind arising from or connected with any broker's or finder's fee or commission or charge claimed to be due any person arising from Indemnitor's conduct with respect to this transaction, other than the commissions authorized in this paragraph.

. . . . .
. . . . .

Sagati/Osman                6.          _m_            _VO_
                                      Trustee        Buyer
                                                    Page 6 of 9

20.  Miscellaneous.

a.  <u>Disputes</u>.  The Bankruptcy Court shall have sole and exclusive jurisdiction over any dispute between the Parties over the terms of this Agreement and over any transaction or event referenced or contemplated by this Agreement.

b.  <u>Bankruptcy Court Jurisdiction</u>. The Bankruptcy Court shall have continuing jurisdiction to interpret and enforce this Agreement.

c.  <u>Attorneys' Fees</u>.  The prevailing party in any dispute arising out of this Agreement shall be entitled to recover as an element of its costs of suit, and not as damages, reasonable attorneys' fees and costs to be fixed by the Bankruptcy Court. The "prevailing party" shall be the party who is entitled to recover its costs of suit, whether or not said suit proceeds to final judgment. A party not entitled to recover its costs shall not recover attorney's fees. No sum for attorneys' fees shall be included in calculating the amount of a judgment for purposes of deciding whether a party is entitled to its costs or attorneys' fees.

d.  <u>Time of the Essence</u>.  Time is of the essence of each provision of this Agreement in which time is an element. Unless the context otherwise requires, all periods terminating on a given day, period of days, or date, shall terminate at 5:00 p.m., Pacific Standard Time, on that day or date, and reference to "days" shall refer to calendar days.

e.  <u>Amendment and Waiver</u>. Neither this Agreement, nor any of the provisions hereof, may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

f.  <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and assigns.

g.  <u>Headings</u>.  Paragraph  headings contained in this Agreement are for reference purposes only, and shall not affect in any way the meaning or interpretation of this Agreement.

h.  <u>Third Party Rights</u>. Except with respect to the releases provided for above, no rights are intended to be created in any person not a party to this Agreement.

i.  <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together constitute one and the same instrument.

j.  <u>Entire Agreement</u>. This Agreement sets forth the entire agreement among the Parties and fully supersedes any and all prior agreements or understandings between the Parties pertaining to the subject matter of this Agreement.

k.  <u>Understanding of the Parties</u>. The Parties have each read this Agreement carefully, and the contents hereof are known and understood by all, and the Agreement is signed freely by each person executing this Agreement. Prior to the execution of this Agreement by the Parties, and each of them, each of the Parties hereto has had the opportunity to receive independent legal advice by attorneys of his or her choice with respect to the advisability of executing this Agreement.

l.  <u>No Statements, Representations, and/or Reliance</u>.  Except as expressly stated in this Agreement, neither of the Parties hereto has made any statement or representation to any other party regarding any fact relied upon by such other party entering into this Agreement, and each of the Parties specifically does not rely upon any statement, representation or promise of any other party in executing this Agreement, except as expressly stated in this Agreement.

m.  <u>Construing the Agreement</u>.  This Agreement shall be construed without regard as to which party drafted the Agreement, and this Agreement shall be construed as if the Parties hereto participated equally in the drafting of the Agreement.

Trustee                VO
                       Buyer
                       Page 7 of 9

n.    **Applicable Law**. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California and applicable federal law.

o.    **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but if any provision of this Agreement shall be invalid, or prohibited thereunder, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

p.    **Recitals**. The recitals at the beginning of this Agreement are incorporated herein by this reference.

q.    **Terms**. Whenever the singular number is used in this Agreement, and when required by the context, the same shall include the plural, and the masculine, and feminine and neuter genders shall each include the others.

r.    **Representations and Warranties**.    All representations and warranties contained herein shall survive the execution and delivery of this Agreement. All obligations of the Parties to this Agreement which have not been fully performed, paid and satisfied as of the Execution Date, shall survive the execution and delivery of this Agreement.

## SIGNATURES OF THE PARTIES

OFFER

As of the Execution Date, the undersigned offers and agrees to buy the Real Property on the terms and conditions stated in this Agreement and acknowledges receiving a copy of this Agreement.

BUYER:


_____
Vahid Osman, M.D.



ACCEPTANCE

As of the Execution Date, Trustee accepts the foregoing offer to purchase the Real Property and agrees to sell the Real Property to Buyer on the terms and conditions specified in this Agreement. Trustee acknowledges receipt of a copy of this Agreement and authorizes Estate Broker to deliver a signed copy to Buyer.

ESTATE:

By:    _____
Nancy Hoffmeier Zamora, Esq., Trustee
Chapter 7 Estate of Fay Abdi Sagati
In re Fay Abdi Sagati
Case No. 1:14-bk-10982-MT


Sagati/Osman                                8.                      Trustee        Buyer
                                                                                   Page 8 of 9

## SIGNATURE OF THE BROKER

### BROKER'S CONSENT

Estate Broker consents to the commission provision in Paragraph 19 above. By signing below, Estate Broker acknowledges that any and all disputes arising under this Agreement or related to the sale of the Real Property are subject to the jurisdiction of the Bankruptcy Court. The signing of this paragraph shall not result in Estate Broker being deemed a party to this Agreement.

**ESTATE BROKER:**

_____

Behnaz Tavakoli, Real Estate Agent
Rodeo Realty, Inc.

Sagoti/Osman

9.

Trustee    VO
Buyer
Page 9 of 9



CALIFORNIA
ASSOCIATION
OF REALTORS®

**SHORT SALE ADDENDUM**
(C.A.R. Form SSA, Revised 4/12)

This is an addendum to the ☒ California Residential Purchase Agreement, ☐ Counter Offer, ☐ Other _____
("Agreement"), dated _**July 14, 2014**_,

on property known as _____ **21641 Pacific Coast Highway, Malibu, CA  90265** _____
("Property"), between _____ **Vahid Osman, M.D.** _____
("Buyer") and _____ **Nancy Zamora Chapter 7 Trustee** _____
("Seller").

## 1. SHORT SALE APPROVAL:

**A.** This Agreement is contingent upon Seller's receipt of and delivery to Buyer of written consent ("Short Sale Lenders' Consent") to the Agreement from all existing secured lenders and lienholders ("Short Sale Lenders"), by 5:00 P.M. no later than 45 (or ☐ _____ ) Days After Acceptance (or ☐ on _____ date) ("Short Sale Contingency Date"). If Buyer or Seller cancels this Agreement prior to the Short Sale Contingency Date, that party may be in breach of the Agreement unless the cancellation is made pursuant to some other paragraph in this addendum or in the Agreement, whether or not time periods in the Agreement have commenced.

**B.** Short Sale Lenders' Consent means that all Short Sale Lenders shall collectively agree to reduce their respective loan balances by an amount sufficient to permit the proceeds from the sale of the Property to pay the existing balances on loans secured by the Property, real property taxes, brokerage commissions, closing costs, and other monetary obligations the Agreement requires Seller to pay at Close Of Escrow (including, but not limited to, escrow charges, title charges, documentary transfer taxes, prorations, retrofit costs, Homeowners Association Fees and Repairs) without requiring Seller to place any funds into escrow or have any continuing obligation to Short Sale Lenders.

**C.** (i) Seller shall Deliver to Buyer a copy of Short Sale Lenders' Consent or term sheet(s) within 3 (or ☐ _____ ) Days After receipt by Seller. (ii) Seller's presentation to Buyer of Short Sale Lender's Consent satisfying 1B removes the contingency in 1A.

**D.** If by the Short Sale Contingency Date, (i) Seller has not received Short Sale Lenders' Consent satisfying 1B, Seller may in writing cancel this Agreement, or (ii) Buyer has not received a copy of Short Sale Lenders' Consent satisfying 1B, Buyer may cancel this Agreement in writing. In either case, Buyer shall be entitled to return of any remaining deposit delivered to escrow.

**E.** Seller shall reasonably cooperate with existing Short Sale Lenders in the short sale process, but neither Seller nor Buyer is obligated to change the terms of their Agreement to satisfy Short Sale Lenders' consent or term sheet(s).

**F.** If Short Sale Lenders' written consent or term sheet(s) provided to Seller require changes to the Agreement in order to satisfy the terms of 1B, (i) neither Buyer nor Seller shall be obligated to continue negotiations to satisfy any of the requirements of the term sheet(s) (ii) either party may in writing cancel this Agreement and (iii) Seller is advised to seek legal, accounting and tax advice before agreeing to any such changes. If the Agreement is cancelled pursuant to this paragraph, Buyer shall be entitled to return of any remaining deposit delivered to escrow.

## 2. TIME PERIODS. Time periods in the Agreement for inspections, contingencies, covenants, and other obligations:
(i) shall begin the Day After Seller delivers to Buyer Short Sale Lenders' Consent satisfying 1B. However, time periods for providing pre-approval/pre-qualification letters and verification of down payment and closing costs shall nonetheless begin as otherwise specified in the Agreement;
or (ii) (if checked) ☐ shall begin as specified in the Agreement.

Buyer's Initials ( _VO_ ) ( _____ )                                    Seller's Initials ( _M_ ) ( _____ )

The copyright laws of the United States (TITLE 17 U.S. Code) forbid the unauthorized reproduction of this form by any means, including facsimile or computerized formats.
Copyright © 2007-2012, CALIFORNIA ASSOCIATION OF REALTORS®. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.
Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

SSA REVISED 4/12 (PAGE 1 OF 2)        **SHORT SALE ADDENDUM (SSA PAGE 1 OF 2)**

| Agent: Behnaz Tavakoli | Phone: 818.657.4607 | Fax: 818.222.7872 | Prepared using zipForm® software |
|---|---|---|---|
| Broker: Rodeo Realty, 23901 Calabasas Rd. Suite 1050 Calabasas, CA 91302 | | | |

*21641 Pacific Coast Highway*

Property Address: *Malibu, CA  90265*                                    Date: *July 14, 2014*

3. **BUYER'S DEPOSIT CHECK.** Buyer's deposit check shall be delivered to escrow within:
   **(i)** 3 business Days After Seller delivers to Buyer Short Sale Lenders' Consent satisfying 1B, or **(ii)** (if checked) ☐ as specified in the Agreement.

4. **NO ASSURANCE OF LENDER APPROVAL.** Buyer and Seller understand that Short Sale Lenders: **(i)** are not obligated to give consent to a short sale; **(ii)** may require Seller to forward any other offer received; and **(iii)** may give consent to other offers. Additionally, Short Sale Lenders may require that, in order to obtain their approval for a short sale, some terms of the Agreement, such as the Close of Escrow, be amended or that Seller sign a personal note or some other obligation for all or a portion of the amount of the secured debt reduction. Buyer and Seller do not have to agree to any of Short Sale Lenders' proposed terms. Buyer, Seller and Brokers do not have control over whether Short Sale Lenders will consent to a short sale, or control over any act, omission, or decision by any Short Sale Lender in the short sale process.

5. **BUYER AND SELLER COSTS.** Buyer and Seller acknowledge that each of them may incur costs in connection with rights or obligations under the Agreement. These costs may include, but are not limited to, payments for loan applications, inspections, appraisals, and other reports. Such costs will be the sole responsibility of the party incurring them if Short Sale Lenders do not consent to the transaction or either party cancels the transaction pursuant to the Agreement.

6. **OTHER OFFERS.** Unless otherwise agreed in writing, after Buyer's offer has been accepted by Seller, **(i)** Seller has the right to continue to market the Property for back-up offers; **(ii)** Seller has the right to accept back-up offers (C.A.R. Form PAA, Paragraph 1), and subject to Short Sale Lender(s) requirements present to Short Sale Lender(s) any accepted back-up offers that are received; and **(iii)** Seller shall notify buyer when any accepted back-up offers, are presented to Short Sale Lender(s).

7. **CREDIT, LEGAL AND TAX ADVICE.** Seller is informed that a short sale may have credit or legal consequences and may result in taxable income to Seller. **Seller is advised to seek advice from an attorney, certified public accountant or other expert regarding such potential consequences of a short sale.**

**By signing below, Buyer and Seller each acknowledge that they have read, understand, accept and have received a copy of this Short Sale Addendum.**

Date *July 14, 2014*                          Date *July 14, 2014*

Buyer V. Osman,                               Seller *Nancy Zamora Chapter 7 Trustee*
*Vahid Osman, M.D.*

Buyer _____                  Seller _____

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

| Reviewed by _____ Date _____ |

CALIFORNIA
ASSOCIATION
OF REALTORS®

**CONFIRMATION OF REAL ESTATE AGENCY
RELATIONSHIPS**
(As required by the Civil Code)
(C.A.R. Form AC, Revised 04/08)

Subject Property Address _____ *21641 Pacific Coast Highway, Malibu, CA   90265*

The following agency relationship(s) is/are hereby confirmed for this transaction:

**LISTING AGENT:** _____ *Rodeo Realty* _____
(Print Firm Name)

is the agent of (check one):

☐ the Seller/Landlord exclusively; or

☒ both the Buyer/Tenant and Seller/Landlord

**SELLING AGENT:** _____ *Rodeo Realty* _____
(Print Firm Name)

(if not the same as Listing Agent)

is the agent of (check one):

☐ the Buyer/Tenant exclusively; or

☐ the Seller/Landlord exclusively; or

☐ both the Buyer/Tenant and Seller/Landlord

I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS CONFIRMATION.

Seller/Landlord *Nancy Zamora Chapter 7 Trustee* _____ Date *07/14/2014*
  Nancy Zamora Chapter 7 Trustee

Seller/Landlord _____ Date _____

Buyer/Tenant *V. Osman.* _____ Date *07/14/2014*
  Vahid Osman, M.D.

Buyer/Tenant _____ Date _____

Real Estate Broker (Selling Firm) _____ *Rodeo Realty* _____

By _____ Date *07/14/2014*
  Behnaz Tavakoli

Real Estate Broker (Listing Firm) _____ *Rodeo Realty* _____

By _____ Date *07/14/2014*
  Behnaz Tavakoli

**A REAL ESTATE BROKER IS QUALIFIED TO ADVISE ON REAL ESTATE. IF YOU DESIRE LEGAL ADVICE,
CONSULT YOUR ATTORNEY.**

This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of this form by any means, including facsimile or computerized formats.
Copyright © 1987 - 2008, CALIFORNIA ASSOCIATION OF REALTORS®

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

**CONFIRMATION REAL ESTATE AGENCY RELATIONSHIPS (AC PAGE 1 OF 1)**

| Agent: Behnaz Tavakoli | Phone: 818.657.4607 | Fax: 818.222.7872 | Prepared using zipForm® software |
|---|---|---|---|
| Broker: Rodeo Realty, 23901 Calabasas Rd. Suite 1050 Calabasas, CA 91302 | | | |



CALIFORNIA
ASSOCIATION
OF REALTORS®

## DISCLOSURE AND CONSENT FOR REPRESENTATION OF MORE THAN ONE BUYER OR SELLER

(C.A.R. Form DA, 11/06)

A real estate broker, whether a corporation, partnership or sole proprietorship, ("Broker") may represent more than one buyer or seller provided the Broker has made a disclosure and the principals have given their consent. This multiple representation can occur through an individual licensed as a broker or through different associate licensees acting for the Broker. The associates licensees may be working out of the same or different office locations.

Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, may make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

Buyer and Seller understand that Broker may represent more than one buyer or seller and even both buyer and seller on the same transaction.

If Seller is represented by Broker, Seller acknowledges that Broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both Seller and Buyer in that transaction.

If Buyer is represented by Broker, Buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both Buyer and Seller with regard to that property.

In the event of dual agency, Seller and Buyer agree that: **(a)** Broker, without the prior written consent of the Buyer, will not disclose to Seller that the Buyer is willing to pay a price greater than the offered price; **(b)** Broker, without the prior written consent of the Seller, will not disclose to the Buyer that Seller is willing to sell property at a price less than the listing price; and **(c)** other than as set forth in (a) and (b) above, a Dual Agent is obligated to disclose known facts materially affecting the value or desirability of the property to both parties.

**NON CONFIDENTIALITY OF OFFERS:** Buyer is advised that Seller or Listing Agent may disclose the existence, terms, or conditions of Buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the Listing Agent's marketing strategy and the instructions of the Seller.

**Seller and/or Buyer acknowledges reading and understanding this Disclosure and Consent for Representation of More Than One Buyer or Seller and agrees to the dual agency possibility disclosed.**

☐ Seller ☒ Buyer   _J. Oirman_   Date _7/14/14_
Vahid Osman, M.D.

☐ Seller ☐ Buyer _____   Date _____

Real Estate Broker (Firm) _Rodeo Realty_   BRE Lic # _00951359_

By _Behnaz Tavakoli_   BRE Lic # _01024710_   Date _7/15/14_

© 2013, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

DA 11/06 (PAGE 1 OF 1)

**REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (DA PAGE 1 OF 1)**

| Agent: Behnaz Tavakoli | Phone: 818.657.4607 | Fax:818.222.7872 | Prepared using zipForm® software |
|---|---|---|---|
| Broker: Rodeo Realty, 23901 Calabasas Rd. Suite 1060 Calabasas, CA 91302 | | | |



CALIFORNIA
ASSOCIATION
OF REALTORS®

# DISCLOSURE REGARDING
## REAL ESTATE AGENCY RELATIONSHIP
(Selling Firm to Buyer)
(As required by the Civil Code)
(C.A.R. Form AD, Revised 11/12)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest in a dwelling exceeding one year as per Civil Code section 2079.13(j) and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**
A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b) A duty of honest and fair dealing and good faith.
    (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**
A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b) A duty of honest and fair dealing and good faith.
    (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.
An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**
A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b) Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.
The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.
Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).

☒ Buyer ☐ Seller ☐ Landlord ☐ Tenant   _V. Osman_                Date _7/14/14_
                                              Vahid Osman, M.D.

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant   _____   Date _____

Agent                 _Rodeo Realty_                   BRE Lic. # _00951359_
                  Real Estate Broker (Firm)
By _____   BRE Lic. # _01024710_     Date _7/15/14_
      (Salesperson or Broker-Associate) _Behnaz Tavakoli_

---

Agency Disclosure Compliance (Civil Code §2079.14):
- When the listing brokerage company also represents Buyer/Tenant: The Listing Agent shall have one AD form signed by Seller/Landlord and a different AD form signed by Buyer/Tenant.
- When Seller/Landlord and Buyer/Tenant are represented by different brokerage companies: (i) the Listing Agent shall have one AD form signed by Seller/Landlord and (ii) the Buyer's/Tenant's Agent shall have one AD form signed by Buyer/Tenant and either that same or a different AD form presented to Seller/Landlord for signature prior to presentation of the offer. If the same form is used, Seller may sign here:

_Nancy Zamora Chapter 7 Trustee_     Date _7/15/14_           Seller/Landlord                          Date
(Seller/Landlord)
Nancy Zamora Chapter 7 Trustee

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2010, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Reviewed by _____ Date _____



AD REVISED 11/12 (PAGE 1 OF 2)
**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)**

| Agent: Behnaz Tavakoli | Phone: 818.657.4607 | Fax: 818.222.7872 | Prepared using zipForm® software |
|---|---|---|---|
| Broker: Rodeo Realty, 23901 Calabasas Rd. Suite 1050 Calabasas, CA 91302 | | | |

## CIVIL CODE SECTIONS 2079.24 (2079.16 APPEARS ON THE FRONT)

2079.13 As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings: (a) "Agent" means a person acting under provisions of title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. (b) "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the associate licensee functions. (c) "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee. (d) "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction. (e) "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer. (f) "Listing agent" means a person who has obtained a listing of real property to act as an agent for compensation. (g) "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent. (h) "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. (i) "Offer to purchase" means a written contract executed by a buyer acting through a selling agent which becomes the contract for the sale of the real property upon acceptance by the seller. (j) "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property which constitutes or is improved with one to four dwelling units, any leasehold in this type of property exceeding one year's duration, and mobile homes, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. (k) "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in that transaction, and includes a listing or an offer to purchase. (l) "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. (m) "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor. (n) "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for the real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller. (o) "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title 9. However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.
2079.14 Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgement of receipt from that seller or buyer, or both, as provided in this section or Section 2079.15, as follows: (a) The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. (b) The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a). (c) Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (and acknowledgement of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgement of receipt is required. (d) The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer.
2079.15 In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent, or an associate licensee acting for an agent, shall set forth, sign, and date a written declaration of the facts of the refusal.
2079.16 Reproduced on Page 1 of this AD form.
2079.17 (a) As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer's agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. (b) As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller.
(c) The confirmation required by subdivisions (a) and (b) shall be in the following form.

|  |  |
|---|---|
| (DO NOT COMPLETE, SAMPLE ONLY) | is the agent of (check one): ☐ the seller exclusively; or ☐ both the buyer and seller. |
| (Name of Listing Agent) |  |
| (DO NOT COMPLETE, SAMPLE ONLY) | is the agent of (check one): ☒ the buyer exclusively; or ☐ the seller exclusively; or ☐ both the buyer and seller. |
| (Name of Selling Agent if not the same as the Listing Agent) |  |

(d) The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.
2079.18 No selling agent in a real property transaction may act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.
2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, of any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.
2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.
2079.21 A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.
2079.22 Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a dual agent.
2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.
2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



Reviewed by _____ Date _____

AD REVISED 11/12 (PAGE 2 OF 2)
**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**   21563 Pacific Coast

**RODEO REALTY**

## ADDENDUM TO PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS
The following paragraphs are hereby incorporated in, and form a part of the Real Estate Purchase Agreement and Joint Escrow Instructions

Dated: 07/14/2014 _____ and concerning property at 21641 Pacific Coast Highway, Malibu, CA 90265

**Broker Compensation:** "NOTICE": THE AMOUNT OR RATE OF REAL ESTATE COMMISSIONS IS NOT FIXED BY LAW; THEY ARE SET BY EACH BROKER INDIVIDUALLY AND MAY BE NEGOTIABLE BETWEEN THE BROKER AND BUYER.

Buyer, if represented by Rodeo Realty, agrees to pay a Buyer's Broker Commission to Rodeo Realty in the amount of $ 0 _____ as compensation for services rendered. Buyer hereby irrevocably assigns and instructs escrow holder to pay Rodeo Realty the above mentioned amount upon the closing of escrow.

**Buyers Inspections:** Buyer is strongly advised by Rodeo Realty to engage qualified licensed professionals to conduct both physical and geological inspections on both the property and improvements. Buyer understands that there are often significant differences between inspectors who perform physical and geological inspections. Buyer assumes responsibility to determine their inspector's qualifications, licensing, insurance coverage, and scope of inspection prior to employing them. The selection of any inspector shall be at the sole discretion of the Buyer.

**Waiver of Professional Physical or Geological Inspection:** In the event Buyer elects not to hire qualified licensed professionals to conduct physical and/or geological inspections, Buyer is acting against the advice of Rodeo Realty and acknowledges that adverse physical and geological conditions may exist that are presently unknown, but that may have been identified by such inspections. In such event Buyer agrees to hold Broker harmless from any loss or damage suffered by Buyer for any geological or physical conditions or defects which may have been discovered had Buyer hired appropriate professionals.

**Brokers Inspection Disclosure:** Your Rodeo Realty agent, as required by law, will conduct a visual inspection of the reasonably accessible areas of the property. They will not go into the attic, on the roof, or under the home. Buyer and Seller acknowledge and agree that Brokers and their sales agents do not have the knowledge, tools, education, or expertise to identify or determine the seriousness of structural, geological, drainage, toxic/environmental hazards, plumbing, electrical, waste disposal, or roofing problems. They are not qualified to test appliances to determine if they are operating properly. Therefore, Buyer and Seller acknowledge and agree that Rodeo Realty, and its agents can not be held responsible for defects that are not visually observable in the reasonably accessible areas of the property.

**Waste Disposal System:** Buyer and Seller are aware that Broker makes no implied or express warranty as to the existence and/or condition of the waste disposal system for the subject property. Many types of inspections are available, including sending a camera down the sewer line, as well as septic and other inspections. Buyer is recommended to conduct these inspections. Buyer and Seller are further advised that the existence of a Sewer Permit does not guarantee that the property is connected to sewer. Buyer is advised to make own independent investigation as to the type and adequacy of the waste disposal system at subject property.

**Toxic Mold:** Buyer is advised to have an environmental inspection by a qualified professional to inspect the property for the existence of mold, funguses, spores, and airborne bacteria or any organisms or conditions that may lead to their formation during Buyer's contingency period. Buyer and Seller are advised that Brokers and sales agents are not trained to identify or locate mold, funguses, spores or airborne bacteria. The Brokers and sales agents have not made any representation, express or implied, as to the existence or non-existence of mold, funguses, spores, or airborne bacteria in or on the subject property.

**Defective Furnaces:** The U.S. Consumer Product Safety Commission (CPSC) has issued a warning regarding certain *gas-fired horizontal forced-air furnaces* that present a substantial risk of fire. These furnaces were manufactured from 1983 through 1994 by Consolidated Industries (formerly Premier Furnace Company) and were marketed under many different brand names. Homes built before 1983 or after 1994 could still have the furnaces in question due to replacements or remodeling. It is recommended to the Buyer and the Seller that this issue be investigated by a qualified professional to determine if the furnace in this property is defective or dangerous. Local gas companies will inspect furnaces at no charge, and if the furnace is one of the models in question; they will indicate that it should not be used. The gas company will not make specific recommendations. If the furnace falls within the category identified by the CPSC, a gas furnace professional should be retained to make a more specific determination.

**Rent Control:** Buyer is aware the subject property may be located in an area subject to rent control ordinance. Buyer's ability to increase rent, evict tenants, and other related matters may be restricted by said ordinance. Buyer may also be required to pay monetary relocation assistance to any tenants who are evicted by Buyer for any reason. This relocation assistance may amount to several thousand dollars based upon the category of tenant involved. Broker strongly recommend Buyer contact the local government entity responsible for administering the rent control ordinance, to determine the effect of the local ordinance on subject property.

Buyer and Seller acknowledge receipt of copy of this page, which constitutes Page 1 of 3 Pages.
Buyer's Initials ( ) ( ____ ) Seller's Initials ( ) ( ____ ) Broker's Initials (B.T) Broker's Initials (B.T)

rev. 6/14

Property Address: 21641 Pacific Coast Highway, Malibu, CA 90265    Date: 07/14/2014

Information From Lender: Listing agent is authorized to contact Buyer's lender directly regarding progress of loan application. Selling agent will provide listing agent with name and telephone number of lender.

Report of Residential Property Records and Pending Special Assessment Liens: If the subject property is residential and located in the City of Los Angeles, Seller shall pay for and deliver to Buyer, prior to close of escrow, a "Report of Residential Property Records and Pending Special Assessment Liens" in accordance with Los Angeles City Ordinance No. 144.942. Home Protection/Warranty Plans: Buyer and Seller acknowledge that although Brokers may provide names and supply literature on the availability of home protection plans, the selection of any individual plan is at the sole discretion of the Buyer and Seller. Buyer and Seller are advised to make their own investigation as to the exact coverage and what limitations and exclusions individual policies contain.

Impact Hazard Glazing/Smoke Detectors/Water Heater Strapping/Water Saving Devices/Earthquake Gas Shut Off Valve: If the subject property is located in the City of Los Angeles, Seller agrees to comply with: Section 91.2406.7 L.A.M.C. requiring ALL external sliding glass doors to be impact hazard glazing (tempered glass); Smoke Detector Section 91.8603 L.A.M.C, as applicable; water conservation devices in compliance with City Ordinance No. 172075; install approved hot water heater strapping and install earthquake shut off valve on the gas meter as per City Ordinance No. 171874 prior to the close of escrow. Seller is advised to use a licensed retrofit company, and/or obtain all required permits.

Future Development: Buyer is aware that there are hundreds of development projects, both public and private, that may be under way or proposed. Broker strongly advises Buyer to make their own independent investigation and consult appropriate governmental agencies to determine possible future development and planning which may affect the subject property. Broker and its agents are to be held harmless regarding future development and planning.

Megan's Law Disclosure: Buyer is aware that information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov.

Related Services: Buyer and Seller acknowledge that although Broker may suggest firms dealing with related services such as escrow, title insurance, pest control, physical and geological inspections, home protection plan, etc., the selection shall be at the sole discretion of the Buyer and Seller. Broker assumes no responsibility for performance of those firms suggested. The Broker or its sales agents herein may refer the Buyer to a lending institution to obtain loans as required to complete this transaction. In connection with any such referral, Broker may or may not receive a commission. It is mutually agreed and understood that Buyer has made their own independent investigation of available financing and is in no way relying on the recommendation of Broker in regards to the financing they ultimately accept and, in fact, is free to obtain financing through any source unless contractually stipulated to the contrary between Buyer and Seller.

Buyer's Subsequent Purchase: In the event this transaction is not concluded and within twelve (12) months following the date of this offer, should Buyer or any related person, acting directly or indirectly, acquire the property or any interest in the property from Seller, Seller agrees to pay commission as set forth in Seller's listing agreement or, if there is no listing agreement, as specified in the original purchase agreement between Seller and Buyer. For purposes of this agreement, "related person" includes any person related by blood, marriage, or business relationship, and any entity that controls or is controlled by Buyer or any related person excluding the Brokers herein.

Permits: Broker recommends that Buyer obtain all permits and certificates of occupancy to the property from government agencies and present copies to Buyers' inspectors so that they can interpret them for the Buyer. Buyer acknowledges that Brokers and their sales agents are not contractors and are not qualified to interpret permits and certificates of occupancy.

Square Footage & Lot Size: Rodeo Realty, nor its agents have verified lot size and square footage. Broker has not verified the accuracy of the tax assessor's information, and advises Buyer to make their own independent investigation of same. Buyer agrees to hold Broker and its agents harmless in regard to lot size and square footage.

Buyer: Vahid Osman, M.D.    Date: 07/14/2014    Seller: Nancy Zamora Chapter 7 Trustee    Date: 07/14/2014
Buyer: V. Osman.    Date: 07/14/2014    Seller: _Nancy Zamora Chapter 7 Trustee_    Date: 07/14/2014
Broker: Rodeo Realty    Broker: Rodeo Realty
By: Behnaz Tavakoli    By: Behnaz Tavakoli

rev. 6/14

# RODEO REALTY

Fine Estates*

## AFFILIATED CONTROLLED BUSINESS ARRANGEMENT DISCLOSURE

Property Address: 21641 Pacific Coast Highway, Malibu, Ca 90265 _____ Date: 07/14/2014 _____

The purpose of this disclosure is to give the parties notice that Rodeo Realty has a business relationship which includes common ownership and shared financial interests with the following service providers:

A. ESCROW SERVICES: ENCORE ESCROW COMPANY, INC. is a provider of escrow services and has common ownership with Rodeo Realty, Inc. Encore Escrow Company, Inc.'s scheduled rates include the following: The base escrow fee to be paid by each buyer and seller is $200.00 plus $2.00 per thousand calculated on the sales price. The normal and customary documentation fee is between $100.00 - $200.00. If the buyer is obtaining a new loan there are general variable charges which include, without limitation, a loan tie-in fee which varies between $100.00 - $250.00, as well as other miscellaneous charges which may apply, including a fee for ordering insurance or city compliance reports, notary fees, messenger services, and fee for Beneficiary Demands.

B. MORTGAGE BROKERAGE: L.A. MORTGAGE, INC. is a provider of mortgage brokerage services and has common ownership with Rodeo Realty, Inc. The following are estimated charges or ranges of charges for settlement services:

| Settlement Services: | Ranges of Estimated Charges | Settlement Services: | Ranges of Estimated Charges: |
|---|---|---|---|
| Appraisal Fee | $150.00 to $800.00 (depending on property value) | Loan Origination Fee | 0% to 2.5% (of the loan amount) |
| Credit Report Fee | $16.00 to $95.00 (depending on employment status) | Processing Fee | $100.00 to $595.00 |
| Tax Service Fee | $65.00 to $120.00 | Underwriting Fee | $250.00 to $500.00 |
| Document Preparation Fee | $225.00 to $395.00 | | |

If a Loan Origination fee (also known as "points"), is charged by the lender, the controlled service providers, as well as Rodeo Realty, may receive a percentage of such fee.

C. TITLE INSURANCE SERVICES: PROGRESSIVE TITLE COMPANY, INC. (PTC) is a provider of title insurance. The owners of Rodeo Realty, Inc. hold a 24% interest in an entity which in turn owns 100% of PTC. The following are estimated charges or range of charges for the settlement services listed:

| Settlement Service | Owner's or Lender's Policy (1108-1110) for: | | | Lender's policy simultaneously issued with Owner's Policy (1108-1110) for: | |
|---|---|---|---|---|---|
| | HUD-I Description/Line Designation | Charge or Range of Charges | | HUD-I Description/Line Designation | Charge or Range of Charges |
| Progressive Title Company, Inc. provides searches of public records that bring to your attention any known problems with the property's title before closing, and insures against loss due to certain title defects. | $250,000 home | $714 -- 1020 | | $250,000 home | $400 - 500 |
| | $500,000 home | $1100 -- 1572 | | $500,000 home | $500 - 600 |
| | $750,000 home | $1450 -- 2072 | | $750,000 home | $650 - 750 |
| | $1,000,000 home | $1800 -- 2572 | | $1,000,000 home | $800 - 897 |
| | $1,500,000 home | $2343 -- 3347 | | $1,500,000 home | $1050 - 1129 |

*For higher amounts of coverage please consult with a Progressive Title Company, Inc. employee.*

The estimate of charges or ranges listed above for ENCORE ESCROW COMPANY, INC., L.A. MORTGAGE, INC., and PROGRESSIVE TITLE COMPANY, INC. are estimated to be accurate as of the date hereof but are subject to change without notice. Other fees and expenses may apply. The ranges of charges listed above may vary depending upon the product, type of loan, or other services which are selected by the parties to the transaction. A lender is allowed to require the use of certain service providers chosen by the lender.

You are NOT required to use the listed providers as a condition for purchase of subject property. THERE ARE OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WHO OFFER SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THE SERVICES.

The estimates set forth above shall not be binding upon the service providers or Rodeo Realty. Seller and/or Buyer acknowledge receipt of this disclosure and understand that the above companies may receive financial benefit as a result of this referral. Each party should request information directly from the provider as to the costs and availability of services being offered at the time of the transaction.

Buyer: Vahid Osman, M.D. _____ Date: 07/14/2014

Buyer: V. Osman _____ Date: 07/14/2014

Broker: Rodeo Realty

By: Behnaz Tavakoli _____

Seller: Nancy Zamora Chapter 7 Trustee _____ Date: 07/14/2014

Seller: Nancy Zamora Chapter 7 Trustee _____ Date: 07/14/2014

Broker: Rodeo Realty

By: Behnaz Tavakoli _____

rev. 6/14

Rev. 03/15/11

# Malibu/Topanga Disclosure Addendum

This is an Addendum to that certain California Residential/Vacant Land Purchase Agreement & Joint Escrow Instructions dated 07/14/14 by and between Nancy Zamora Chapter 7 Trustee _____ as Seller(s) and Vahid Osman, M.D. _____ as Buyer(s), regarding that certain real property commonly known as 21641 Pacific Coast Highway, Malibu, CA 90265, California.

MALIBU INCORPORATION/COUNTY RESTRICTIONS: As of March 1991, a portion of the area commonly referred to as "Malibu" has been incorporated as the City of Malibu. The balance of what is commonly referred to as "Malibu" remains a part of the unincorporated area of the County of Los Angeles or the County of Ventura. The City of Malibu has imposed new restrictions and standards for construction, remodeling and land development and routinely amends or modifies its regulations and ordinances. Various governmental bodies, such as Site Plan Review Committee, Archaeology Review Board, City Archaeologist, Environmental Review Board, City Biologist, Health Department and Landscape Control, etc., of the City of Malibu may affect, limit or influence Buyers' plans for the Property. Buyer is aware the City of Malibu and the counties of Los Angeles and Ventura have various zoning, land use, building code and other restrictions and requirements regarding use, remodeling and development with which Buyer must comply, such as Significant Ecological Areas (SEA's), Environmentally Sensitive Habitat Areas (ESHA's), flood-hazard zones, Fire Department requirements (road access, water flow and storage, fire hydrant, interior sprinklers, brush clearance, and fuel modification plans), oak tree ordinances, septic setbacks from drainage areas, blue-line streams, slope density calculations limiting building square footage (Topanga Canyon Community Standards District Ordinance), etc. There are also deed restrictions and other private land use restrictions which may affect the Property. It is the responsibility of the Buyer to verify the location of the Property and determine whether any of such laws, rules, regulations or ordinances affect or apply to the Property. Additionally, Buyer is advised to contact the City of Malibu, the County of Los Angeles, the County of Ventura to determine which of the laws or regulations may apply to and affect the Property. The City of Malibu routinely attempts to influence development outside its boundaries through a "sphere of influence" in its General Plan.

CALIFORNIA COASTAL COMMISSION ("CCC"): Buyer and Seller acknowledge remodeling or developing property may be subject to the jurisdiction and requirements of the CCC. The CCC developed a Local Coastal Plan ("LCP") for Los Angeles County in 1986; it is used as a guideline in conjunction with the provisions of the Coastal Act. On September 13, 2002, the CCC adopted a new LCP for Malibu. This plan affects new development and remodeling with new requirements/restrictions/regulations. On November 24, 2004, the City of Malibu adopted the LCP (9/13/02) and is processing all Coastal Development Permits within the City limits. The development of beachfront property may also be impacted by the determination of "mean high tide line" in relation to the boundary lines for beachfront property. Beach parcels being developed may require view corridors on the lot's side yard in addition to side yard setback. Buyer should contact the CCC and the State Lands Commission for more information. Buyer is advised to investigate and satisfy himself/herself during the investigation/contingency period as to any potential ramifications. The fact that a Coastal Development Permit ("CDP") had previously been issued and which has expired is no guarantee that an identical permit will be issued with the same conditions (size, site location, etc.). New restrictive conditions could be imposed such as lesser square footage or a less desirable site location, etc. Buyer is advised to consult a qualified specialist regarding coastal development issues. Public Access: At several points along the Malibu Coastline, property owners have recorded irrevocable Offers to Dedicate ("OTD") public accessways, which, if opened in the future, would provide public access to the shoreline through property which was previously private. Additionally, an OTD easement for vertical/shoreline access may be required for all new development projects when existing or dedicated vertical/shoreline access is not available within 500' of the new development site. Buyer is encouraged to consider the location and impact of such dedications. Buyer is advised to check with the City of Malibu and the CCC for further information.

SHORELINE, BEACH & BLUFF EROSION DEVISES: Brokers and Sellers make no representations as to whether past or existing shoreline protection devices such as seawalls, bulkheads, revetments, etc. were properly engineered and installed with all the required governmental permits. Additionally, in certain situations where beach erosions have occurred, a Geological Hazard Abatement District (GHAD) may be implemented which could result in ongoing future financial obligations and/or assessments.

GRADING AND SIGNIFICANT RIDGELINE ORDINANCE: (Amendment to Santa Monica Mountains North Area Community Standards District) Los Angeles County has adopted a Grading and Ridgeline Ordinance which will have significant impacts on the ability to develop properties in the North Area Plan (that area northerly of the Coastal Zone boundary, past the Ventura (101) Freeway). Buyer is advised to consult the appropriate agency, land-use attorney, and/or planning consultant.

GEOLOGICAL HAZARD ABATEMENT DISTRICT: Currently, the City of Malibu has designated certain geological hazard-abatement districts, including but not limited to Big Rock, Malibu Road, and Calle del Barco/La Costa. Buyer is strongly advised by Broker to check the City of Malibu's zoning codes, obtain an independent geological inspection and consult with the City of Malibu geologist. If Buyer's purchase is based upon the desire/intention for future improvements, additions, or development of the Property, specific issues may be required to be addressed, such as slope stability and/or possible slide waiver, all of which may affect the Buyer's ability to develop the Property. Full investigation should be performed by Buyer's licensed professional(s) to confirm feasibility of such actions.

Buyer and Seller acknowledge receipt of copy of this page, which constitutes Page 1 of 6 Pages.
Rev. 03/15/11

Buyer's Initials (VO) (NO)   Seller's Initials (___) (___)

Malibu/Topanga Disclosure Addendum; Rev. 03/16/11, continued

EARTHQUAKE FAULT ZONE/SEISMIC HAZARD ZONES: The Property may be within an Earthquake Fault Zone (Chapter 7.5 Division 2 of California Public Resources Code Sections 2621-2630) and/or Seismic Hazard Zone (Sections 2690-2699.6). If so, the construction on or development of the Property may be subject to the findings of a geological report, unless such report is waived by the respective city or county. The City of Malibu's geologist currently requires such reports on all properties within its jurisdiction. For further information, contact the geologist for the City of Malibu or the California Geological Survey.

SANTA MONICA MOUNTAINS NATIONAL RECREATION AREA/PARKS: The Santa Monica Mountains National Recreation Area (SAMO) has designations for all properties within its boundaries (fee acquisition, easement, cooperative planning, etc.). Properties in close proximity to the SAMO may have restrictions placed on them that could affect the Buyer's future development of the Property. Many species of native plants and trees, wildlife, wildlife corridors, creeks and streams are protected from disruption under municipal, state, and federal law. Additionally, the City of Malibu has proposed a map designating desired parkland acquisitions. The State of California, Los Angeles County, Ventura County, and The Mountains Restoration Trust also have interest in future parklands and trails. Buyer is advised to check with the appropriate public agencies to determine the impact on the Property, if any.

PRIVATE WASTE DISPOSAL SYSTEM: Buyer and Seller are aware that the Property may be serviced by a private waste disposal system (The "System") consisting of a septic tank, cesspool, seepage pits, distribution box, leach field, leach lines or a combination of such mechanisms, in which case Broker strongly recommends that the System be inspected. No representation or warranty is made by Seller or Broker concerning the condition, operability, size or capacity of the System, nor whether the System is adequate for use by the intended occupants of the Property. Buyer is aware that a change in the number of occupants or in the quantity, composition or methods of depositing waste may affect the efficiency of the System. In addition, the amount of rainfall may also affect the efficiency of the System. Therefore, Buyer should obtain an independent evaluation of the System by a qualified sanitation professional as a part of Buyer's inspection/contingency period. Buyer should verify with the Septic Inspector if septic report includes the tank only, or other additional components of the septic system such as pit(s) and leach field(s). In some cases, Buyer's lender may require a System Inspection. Other System related costs may arise, including but not limited to, locating, pumping, or providing outlets to the ground level. BUYER AND SELLER ARE AWARE THAT ALL THESE COSTS ARE NEGOTIABLE BETWEEN BUYER AND SELLER. Broker is unable to advise Buyer or Seller regarding System-related issues or associated costs, which may be significant. Many factors, including but not limited to natural forces, age, deterioration of materials and the load imposed on the System can cause the System to fail at any time. In the event an existing septic system fails in the future, the System may be required to be upgraded to current health department standards. This could result in additional permits, design, and installation costs; especially for beachfront properties Inspection & Operating Permit Program; Point of Sale (Sanitation/Health Department): On March 10, 2008, the City of Malibu adopted Ordinance No. 321, which is a Comprehensive Onsite Wastewater Treatment System ("OWTS") Inspection and Operating Permit Program. The purpose of the Ordinance is to establish consistent requirements for assuring appropriate operation and maintenance of OWTS. Any person owning real property served by OWTS shall be responsible for (a) obtaining all required inspections and permits, (b) ensuring the continued maintenance and proper functioning of the OWTS, and (c) ensuring any necessary repairs, modifications or upgrades to the OWTS are timely completed and made fully operational.

Operating permits will be required for a permit to repair, alter, modify, replace, renovate or relocate existing OWTS, as well as for any development permit. The issuance of an operation permit by the City of Malibu may include but is not limited to: payment of fees, inspection fees, repair/replacement costs, maintenance fees, and the execution of an enforceable agreement by and between the property owner (buyer and/or seller) and the City of Malibu.

Additionally, there is a provision that prior to any purchase or change of ownership (unless there is a valid, unexpired operating permit) wherein an inspection of the OWTS reveals a need for any repair, modification, upgrade or replacement, the property owner may proceed in accordance with the POINT OF SALE OWTS Inspection and Permitting Procedure, which has a binding "Compliance Agreement" component. Upon any purchase or transfer, the purchaser/transferee has 30 days to file a "Notice of Change in Ownership for Operating Permit". Depending on the allowed use of the property (zoning) and the type of OWTS in use, there are different time periods for which the operating permit is valid, after which there are renewal requirements.

All inspections must be conducted by a City-approved OWTS inspector. The City of Malibu maintains a current list of said inspectors. To obtain a copy of Ordinance No. 321, you may visit the City of Malibu online at www.ci.malibu.ca.us and enter Ordinance No. 321 in the search window, or go to the City of Malibu Environmental Health Office located at 23815 Stuart Ranch Road, Malibu, CA 90265. There are many other aspects of the implementation of Ordinance 321, and broker(s) strongly recommend that Buyer and Seller consult with the appropriate professionals and the City of Malibu Environmental Health Department.

Additionally, all properties being newly developed, repaired, or remodeled may require the installation of advanced/alternative OWTS which would result in significant additional costs as well as require a Coastal Development Permit. Buyer is advised to contact the City of Malibu for further information. By signing the herein disclosure, the Buyer(s) and Seller(s) agree that the Broker(s) shall have no further responsibility or liability regarding compliance with Ordinance No. 321.

Buyer and Seller acknowledge receipt of copy of this page, which constitutes Page 2 of 6 Pages.    Buyer's Initials (VO) (VO)    Seller's Initials (?) (_)
Rev. 03/16/11

Malibu/Topanga Disclosure Addendum, Rev. 03/16/11, continued

SEWERS/WASTEWATER TREATMENT FACILITY(IES) - WATER QUALITY CONTROL BOARD: On November 5, 2009, the California Regional Water Quality Control Board, Los Angeles Region, passed Resolution No. R4-2009-007, which is an amendment to the Water Quality Control Plan for the Coastal Watersheds of Ventura and Los Angeles Counties (Hereafter "Basin Plan") to prohibit on-site wastewater disposal systems ("OWDS's") in the Malibu Civic Center area. This area is defined as lower Winter Canyon watershed, Malibu Valley watershed, and adjacent coastal strips between and including Amarillo Beach and Surfrider Beach. (See attached Map) The designated areas include residential, vacant, condominium and commercial properties.

The Basin Plan prohibits (i) any new OWDS's, (ii) all wastewater discharges in commercial areas from existing systems on November 5, 2015, and (iii) all wastewater discharges in residential areas from existing systems on November 4, 2019. The prohibition does allow for repairs, maintenance, and upgrades to existing OWDS's prior to November 5, 2015 (commercial) and November 4, 2019 (residential).

This resolution was approved on September 21, 2010 by the State Water Resources Control Board, which amended the "Basin Plan". The Amendment of the Plan went into effect on December 23, 2010. There could be fines for non-compliance as well as future monthly/annual assessments to finance construction and maintenance of a centralized (or other) wastewater treatment facility(ies). These amounts could be significant.

Buyer is advised to determine if the property in question is located within the Basin Plan and evaluate any potential developmental restrictions and projected financial impact. Clarifications are available at the City of Malibu or the Los Angeles County Regional Water Quality Control Board.



To view the map more legibly please go to the website link:
http://www.waterboards.ca.gov/losangeles/press_room/announcements/Public-Hearing-Malibu/Malibu_Final_Resolution_Docs/3.%20RESOLUTION.pdf

Buyer and Seller acknowledge receipt of copy of this page, which constitutes Page 3 of 6 Pages.    Buyer's Initials ( VO ) ( NO )    Seller's Initials ( ____ ) ( ____ )
Rev. 03/16/11

Malibu/Topanga Disclosure Addendum, Rev. 03/15/11, continued

ASSESSMENTS/LIENS: Buyer is advised that the Property may be subject to the levy or imposition of a number of assessments that may exist or are proposed for the Malibu area. To the extent that those assessments are levied or imposed upon the Property, the Buyers cost to own the property may be significantly increased. The assessments may be imposed by a number of organizations or pursuant to a number of laws or ordinances, including, but not limited to, homeowners' organizations, CC&R's, Flood Control, Water Table Lowering, Fire Prevention, Undergrounding of Utilities, Sewers (municipal/county maintained), Private Roads, Private Development Agreements, Special Landslide Assessment Districts, geological hazard abatement, etc. Certain fees or assessments, may or may not be delineated on the preliminary title report. For further information, Buyer is advised to contact the City of Malibu, the planning departments of either Los Angeles County or Ventura County, the appropriate Homeowner's Association or City/County assessment or Bond District. Unless stated to the contrary in the Purchase Agreement, Buyer will be solely responsible for the payment of any and all assessments, charges, fees and expenses, including the installment payments on any of the foregoing, which are due following the close of escrow.

SCHOOLS: There is no assurance that the school(s) in the closest proximity to the Property are open for enrollment to Buyer's children, or that the Property is served by a particular school or school district. As a result of various factors, including but not limited to class-size reductions and "open-enrollment" policies, the school(s) actually serving the Property might not be determined until the time of enrollment. Buyer is advised to contact local school(s) for more information and district maps.

TRANSIENT OCCUPANCY TAX: In the event the Buyer leases the subject property on a short-term rental basis (30 days or less); buyer is aware that pursuant to Malibu Municipal Code Section 3.24 and effective July 1, 2009, the City of Malibu has enacted the collection of Transient Occupancy Tax ("TOT") on short-term rentals (30 days or less) of all residential structures (homes, condominiums, apartments, guest houses, etc.). The City of Malibu will impose a twelve percent (12%) tax on the rental amount. All property owners/landlords of short-term rentals will be required to register with the City and pay a one-time $25.00 registration fee. It is the responsibility of the property owner and not the real estate company or agent to obtain the registration and remittance forms and to pay the required tax.

To obtain a complete list of structures qualifying for the TOT, registration packet and information on how to collect and remit the TOT, visit the City's website at www.ci.malibu.ca.us , or contact the Finance Department at (310) 456-2489, ext. 335 for more information.

WATER SHORTAGES AND EMERGENCY WATER CONSERVATION: Buyer acknowledges the Property may be located in an area which may experience serious water shortages. The policies of the local water district and the city and/or county in which the Property is located can result in the occurrence of any or all of the following: (i) limitations on the amount of water available to the Property, (ii) restrictions on the use of water, and (iii) increasingly graduated cost per unit of water used, including but not limited to penalties for excess usage. For further information, Buyer is advised to contact the public or private supplier of water to the Property regarding the supplier's current (or anticipated) policies on water usage and to determine the extent to which those policies may affect Buyer's intended use of the Property.   If the Property is serviced by a private water well, Buyer acknowledges drought conditions and/or low-water table may make it necessary to arrange, through a private supplier, for delivery of water to the Property. For further information, Buyer should contact water truck companies for the costs involved. Additionally, neither Broker nor Seller make any representations regarding water flow or gallons per minute. Buyer is advised to test all components of water wells (electrical, flow, tank, casings, pumps, pressure tanks, etc.) Neither Broker nor Seller makes any representation regarding the quality or potability of any water provided to the Property by any source, i.e. city, county, private company or well. The City of Malibu and Los Angeles and Ventura counties may have differing minimum water flow requirements.

INSURANCE: Buyer is aware that insurance for certain hillside, oceanfront, "brush area", fire hazard zones, flood and other uniquely situated properties may be available only from California Fair Plan ("CFP") or Federal Emergency Management Agency (FEMA). This may increase the cost of insurance for such properties. Buyer is advised to consult with its own insurance agent regarding coverage under CFP and to allow enough time for processing of an application with the CFP or any other insurance carrier. Properties, after transfer, may be reassessed by CFP which may result in surcharges and/or additional clearance requirements. Buyer is advised that homeowner's insurance is increasingly difficult to obtain with excessive time delays in obtaining. Homes with past claims for water or storm damage are particularly vulnerable to rejection. Buyer is advised to inquire about the availability of insurance, as well as past claims against the home being purchased as soon as possible. For further claims history, contact Comprehensive Loss Underwriting Exchange (CLUE) or an insurance agent.

BRUSH CLEARANCE: Property owners are responsible for keeping the brush on their property cleared in accordance with Fire Department regulations. If the property owner does not clear the brush prior to the deadline (usually between April and June) the Los Angeles County Weed Abatement or Ventura County Fire Department Fire Hazard Reduction will clear it after the deadline, seek repayment of the costs from the property owner and possibly impose a lien on the Property to secure repayment. If the property is owned by the Seller, after it is cleared, the Seller will be held responsible for paying the Weed Abatement lien. Buyers and Sellers should ascertain lien status prior to close of escrow.

Buyer and Seller acknowledge receipt of copy of this page, which constitutes Page 4 of 6 Pages.
Rev. 03/15/11

Buyer's Initials (VD) (NG)   Seller's Initials ( ) ( )

Malibu/Topanga Disclosure Addendum, Rev. 03/16/11, continued

NATURAL AND HAZARDOUS CONDITIONS: Buyer and Seller are aware that Malibu and Topanga are rural areas characterized by certain natural hazards and conditions including, but not limited to fires, flooding, severe winds, landslides, mudslides, high wave action on the beach, tsunamis, road closures, wildlife and farm animals/livestock, earthquakes, and sea air, which can have corrosive and potentially dangerous effects on some structural components.

VIEWS: Seller and Broker make no representations as to the preservation of existing or future views from this Property. Views, unless specifically protected by covenants, conditions and restrictions applicable to the Property or adjacent and nearby property, may be affected by many factors including, but not limited to future development and/or growth of trees and vegetation.

DEVELOPMENTAL DISCREPANCIES: Permitted or allowable square footage, septic location, bedroom/bathroom count, etc., as determined by the California Coastal Commission ("CCC") or county or city may not be accurate or conform with each other and may differ from actual constructed or existing improvements. Buyer should investigate these possible discrepancies and determine their effect on allowable remodeling or reconstruction. Broker(s) make(s) no representations regarding the accuracy of any documented or undocumented accounts relating to permitted, allowable, or constructed improvements.

INTEGRATED PHONE SYSTEM: All individual phones and operating systems existing at Property and owned by Seller at date of mutually accepted contract shall be transferred by Seller to Buyer unless agreed upon otherwise.

UNCONDITIONAL CERTIFICATES OF COMPLIANCE/VACANT LAND: Unconditional-Certificates of Compliance ("U-CofC") are necessary in order to verify that a parcel was created legally. U-CofC's are also required in obtaining permits. Buyers and Sellers should check the lot(s) legal status, cost and the time it will take for receipt of a U-CofC with the appropriate jurisdictional agency. Broker further recommends that Buyer consult a land-use attorney and/or planning consultant. The issuance of a Conditional Certificate of Compliance ("CCofC") (where conditions may or may not have been satisfied or removed) may require a coastal permit to legalize the property.

RESIDENTIAL CARE FACILITIES: Under certain circumstances, local, state and federal laws permit residential care facilities which serve six (6) or fewer persons. For information on such facilities, contact the State Department of Social Services, the Department of Health Care Services, the California Department of Public Health, the State Department of Alcohol and Drug Programs, or the City of Malibu.

HORSE/EQUESTRIAN/LIVESTOCK: Certain governmental agencies (city, county, coastal) may require specific permits which may establish certain limitations or mitigations relative to use such as numbers allowed (if any) setbacks from oaks or other trees or from riparian habitat, etc. Buyer is advised to check with the appropriate agency, land-use attorney, and/or planning consultant.

TRAILS/CAMPSITES: Trail easements and improvements to existing trails on private land may be included as a condition of development approval. Buyer is hereby advised to check the "Parkland and Trails System Map" of the Local Coastal Program of the City of Malibu for the potential impact of said trails. The State of California has proposed several overnight campsites in the City of Malibu and adjacent Los Angeles County. Buyer is advised to check with the State of California or the City of Malibu as to the location and potential impact of proposed sites.

MULTI-PANED WINDOWS: Buyer is hereby made aware that broker and seller make no representations as to the condition or warranty of any existing windows that may be or at a later date become defective (fog up). Buyer to investigate and satisfy himself/herself during the investigative contingency period as to the condition of any multi-paned windows.

SEISMIC GAS SHUT-OFF VALVE ORDINANCE: On November 8, 2010 (Effective December 8, 2010) the Malibu City Council adopted Ordinance No. 353 requiring that seismic gas shut-off valves be installed on designated buildings within the City on or after January 1, 2011. Upon the change of ownership, on all new buildings or structures, and on all additions or alterations valued at more than $10,000, these safety devises must be installed. Buyer and Seller are hereby made aware of said Ordinance 353 and that the cost of installation is negotiable.

CARBON MONOXIDE POISONING PREVENTION ACT OF 2010: Seller(s) and Buyer(s) are aware that SB 183 became law on May 7, 2010. Under said law and based on certain parameters, an owner of a "Dwelling unit intended for human occupancy" must install a carbon monoxide device. The date for compliance of existing single-family residences is on or before July 1, 2011, and all other existing dwelling units on or before January 1, 2013. Regulatory specifics are forthcoming from the California State Fire Marshal.

## ADDITIONAL CONTRACTUAL OBLIGATIONS

SELLER DISCLOSURES: Any pertinent reports or studies currently in Seller's possession shall be delivered to Buyer within seven (7) days from date of acceptance. Buyer is also advised to obtain copies of any existing permits available from the appropriate governmental agency (city or county).

MOLD AND FUNGUS: Buyer and Seller are aware that residential, apartment, condominium and single-family residences in Malibu/Topanga, along with other communities in Southern California, may contain various forms of mold and fungus that

Buyer and Seller acknowledge receipt of copy of this page, which constitutes Page 6 of 8 Pages.    Buyer's Initials (NO) (NO)    Seller's Initials (M) ( )
Rev. 03/18/11

Malibu/Topanga Disclosure Addendum, Rev. 03/16/11, continued

may not be visible to the naked eye, which may adversely affect the Property and the health of some individuals. Seller shall disclose to Buyer, in writing, all known facts including water-related leakage and/or damage, which relate to the existence and presence of any mold, decay, mildew, fungus, dry rot or truffle at the Property that is the subject of this transaction. Seller shall disclose to Buyer such facts if Seller has actual knowledge of same, whether or not Seller is asked about such facts by Buyer, any broker, or any agent representing either the Buyer or Seller in this transaction, or when completing any form. The duty to disclose such known facts apply even if the Buyer has agreed to purchase the subject real property in its present condition, without making any physical or visual inspections or even in the event Seller is not required to make any repairs to such Property. Buyer will evaluate Chapter VI (6) of the Environmental Hazards Booklet. It is the Buyer's responsibility and option to determine the actual presence and extent of any mold by conducting his own due diligence/investigations, using qualified experts during the inspection/contingency period.    Real Estate Brokers are not qualified to inspect property for mold or make recommendations or determinations concerning possible treatment of mold or its health or safety issues. Buyer and Seller hereby agree to hold Real Estate Brokers harmless from any liability, recourse, damages (financial or otherwise) that Buyer and Seller may incur as a result of the presence of mold in, on, or around the property.

The following phone numbers/websites are provided to assist the Buyer and Seller, but are not intended to represent all possible or necessary contact numbers needed by Buyer or Seller:

| | |
|---|---|
| City of Malibu | (310) 456-2489 |
| Los Angeles County Department of Regional Planning | (213) 974-6411 |
| Ventura County Planning Department | (805) 654-2488 |
| Los Angeles County Regional Water Quality Control Board (www.swrcb.ca.gov/rwqcb4/) | (213) 576-6600 |
| Santa Monica Mountains National Recreation Area (www.nps.gov/SAMO/index.html) | (805) 370-2301 |
| California Coastal Commission | (805) 585-1800 |
| Los Angeles County Department of Building & Safety | (818) 880-4150 |
| Ventura County Department of Building & Safety | (805) 654-2771 |
| State Lands Commission | (916) 574-1900 |
| Mountains Restoration Trust | (818) 591-1701 |
| California Geological Survey | (213) 239-0878 |
| Comprehensive Loss Underwriting Exchange (CLUE)   www.choicetrust.com | (800) 456-6004 |
| Los Angeles County Weed Abatement | (626) 575-5484 |
| Ventura County Fire Department Hazard Reduction | (805) 389-9769 |
| State Department of Social Services | (916) 324-4031 |
| State Department of Alcohol & Drug Programs | (916) 322-2911 |
| California State Department of Health Services          Recognized under two divisions: | |
| 1) The Department of Health Care Services    (916) 465-4171 | |
| 2) The California Department of Public Health    (916) 558-1784 | |

BUYER IS SPECIFICALLY ADVISED TO COMPLETELY INVESTIGATE AND EVALUATE EACH AND ALL OF THE MATTERS DESCRIBED IN THE FOREGOING DISCLOSURES, DURING THE INSPECTION/CONTINGENCY TIME PERIODS PROVIDED FOR IN THE PURCHASE CONTRACT. SELLER IS SPECIFICALLY ADVISED TO MAKE ANY AND ALL DISCLOSURES WHICH ARE REFERRENCED IN THE FOREGOING.    THE UNDERSIGNED BUYER(S) AND SELLER(S) ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE IMPLICATIONS OF THE INFORMATION PROVIDED AND ACKNOWLEDGE RECEIPT OF A COPY OF THIS ADDENDUM. NEITHER BROKER NOR THE MALIBU ASSOCIATION OF REALTORS® HAS ANY LIABILITY OR RESPONSIBILITY WITH RESPECT TO THE ACCURACY OF THE INFORMATION CONTAINED HEREIN AND NEITHER THE BROKER OR THE MALIBU ASSOCIATION OR REALTORS® GUARANTEES, WARRANTS OR REPRESENTS THAT THE MATTERS CONTAINED HEREIN ARE TRUE, ACCURATE OR CORRECT. THIS MALIBU/TOPANGA DISCLOSURE ADDENDUM IS PROVIDED MERELY FOR THE CONVENIENCE OF SELLER AND BUYER. BUYER IS SOLELY RESPONSIBLE TO MAKE ALL INSPECTIONS AND EXAMINATIONS DESIRED BY BUYER. BUYER SHALL AND HEREBY DOES ASSUME THE FULL RISK OF ANY LOSS OR DAMAGE OCCASIONED BY ANY FACT, CIRCUMSTANCE, CONDITION OR DEFECT PERTAINING THE THE PHYSICAL OR LEGAL CONDITION OF THE PROPERTY AND SHALL SATISFY HIMSELF WITH RESPECT TO ALL APPLICABLE LAWS, STATUTES, REGULATIONS AND REQUIREMENTS OF ALL GOVERNMENTAL BODIES AND AGENCIES CONCERNING THE SALE, USE, DEVELOPMENT, OPERATION, DESIRABILITY, VALUE OR SUITABILITY OF THE PROPERTY.

Buyer: _V·OSman_    Buyer: _____    DATE: 07/14/2014

X Seller: _Nancy Jamora Chapter 7 Trustee_    Seller: _____    DATE: 07/14/2014

OFFICE: Rodeo Realty    Agent: Rodeo Realty _____    DATE: 7/14/15

OFFICE: Rodeo Realty    Agent: _____    DATE: 7/14/15

Buyer and Seller acknowledge receipt of copy of this page, which constitutes Page 8 of 8 Pages.

Rev. 03/16/11



Property Resolution
6101 Condor Drive
Moorpark, CA 93021
(866)573-9564
*fax* (866) 577-7205
propertyresolution@pnmac.com
www.pennymacusa.com

FAY SAGATI
21641 PACIFIC COAST HWY
MALIBU, CA 90265

07/23/2014

RE: **Property Resolution- Short Sale Approval**
Loan Number:
    21641 PACIFIC COAST HWY
    MALIBU, CA 90265

Dear: FAY SAGATI

PennyMac (the servicer) consents to this Request for Approval of Short Sale and agrees to accept all net proceeds from the settlement as full and final satisfaction of the first mortgage indebtedness on the referenced property. This agreement is subject to the following:

A.  **Terms** – The sale and closing comply with all terms and conditions of the Short Sale Agreement between the Servicer and the Borrower as well as all terms and representations provided herein by the Borrower.

B.  **Changes** – Any change to the terms and representations contained in this Request for Approval of Short Sale must be approved by the servicer prior to closing.

C.  **Subordinate Liens** – Prior to releasing any funds to holders of subordinate liens/mortgages, the closing agent must obtain a written commitment from the subordinate lien holder that it will release Borrower from all claims and liability relating to the subordinate lien in exchange for receiving the agreed upon payoff amount. The written commitment is to be sent to the servicer prior to closing the file.

D.  **HUD-1** – The HUD-1 must be approved by PennyMac before PennyMac will accept funds. The final certified HUD-1 must be sent to the servicer within 2 days of the closing.

E.  **Closing and Receipt of Net proceeds** - The transaction must close in accordance with requirements stated in this document. The proceeds due to the servicer must be received by the servicer no later than the date stated on item #6, page three of this approval document. In the event the proceeds are not received on or before the date specified on item #6, a new approval from the servicer is required.

F.  **Bankruptcy** – If you are currently in bankruptcy or you file bankruptcy prior to closing, you must obtain any required consent or approval of the Bankruptcy Court.

G.  **Tax Consequences** – A short payoff of the mortgage may have tax consequences. You are advised to contact a tax professional to determine the extent of tax liability, if any.

H.  **Credit Bureau Reporting** – We will follow standard industry practice and report to the major credit reporting agencies that your mortgage was settled for less than the full payment. We have no control over or responsibility for the impact of this report on your credit score. To learn more about the potential impact of a short sale on your credit you may want to go tohttp://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm .

**This is an attempt by a debt collector to collect a debt. However, if your account is subject to pending bankruptcy proceedings or if you have received a discharge in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt against you personally.**



Property Resolution
6101 Condor Drive
Moorpark, CA 93021
(866)573-9564
*fax* (866) 577-7205
propertyresolution@pnmac.com
www.pennymacusa.com

- **Payment Instructions** – Payoff funds, a final HUD-1 Settlement Statement, the subordinate agreement (if applicable), and this signed agreement must be received by the Servicer by the Proceeds Received Date (item #6, page 3) in accordance with the attached wiring instructions.

Wiring Instructions:

| | |
|---|---|
| Bank Name: | Bank of America |
| ABA Routing Number: | 026009593 |
| Bank Address: | 100 West 33rd Street, New York, NY 10001 |
| For Credit to: | PennyMac Loan Servicing, LLC Payment Clearing Account |
| Account Number: | 12359-83182 |
| For Benefit of: | FAY SAGATI |
| For Final Credit To: | |

I. **Foreclosure sale** – The foreclosure sale date will not be completed, if the short sale agreement is not expired or the agreed upon funds have been received.

J. **Proceeds:** All net proceeds must be approved by PennyMac. The Seller/Borrower will not receive any sale proceeds from this transaction. Any excess funds as a result of this sale must be sent to PennyMac Loan Services, LLC. If the net proceeds from the sale are not sufficient to pay off the total unpaid balance, the Seller/Borrower agrees that as a condition of this approval PennyMac will receive any funds held in an escrow/impound account and any refunds from pre-paid expenses that otherwise would be payable to Seller/Borrower. This includes, but is not limited to, proceeds received from any hazard insurance claims and/or any unearned premiums. These funds also must be made payable directly to PennyMac without recourse.

K. **Property Condition:** The property is being sold in "AS IS" condition. No repairs will be paid for out of the proceeds, unless specifically stated otherwise.

L. **Satisfaction and Release of Liability:** If all of the terms and conditions of this Agreement are met, upon sale and settlement of the property, PENNYMAC will prepare and send for recording a lien release in full satisfaction of the mortgage, foregoing all rights to personal liability or deficiency judgment. Prior to releasing any funds to holders of subordinate liens/mortgages, the closing agent must obtain a written commitment from the subordinate lien holder that it will release Borrower from all claims and liability relating to the subordinate lien in exchange for receiving the agreed upon payoff amount.

You can't list the property with or sell it to anyone that you are related to or have a close personal or business relationship with. In legal language, it must be an "arm's length transaction." If you have a real estate license you can't earn a commission by listing your own property. You may not have any agreements to receive a portion of the commission or the sales price after closing. Any buyer of your property must agree to not sell the home within 90 calendar days of the date it is sold by you. You may not have any expectation that you will be able to buy your house back after the closing. Any knowing violation of the arm's length transaction prohibition may be a violation of federal law. If the above conditions are not met, PennyMac reserves the right to return the payoff funds.

**Terms of Short Sale Approval**        **Loan Number** _____  ___  _

**This is an attempt by a debt collector to collect a debt. However, if your account is subject to pending bankruptcy proceedings or if you have received a discharge in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt against you personally.**

**PennyMac**

Property Resolution
6101 Condor Drive
Moorpark, CA 93021
(866)573-9564
*fax* (866) 577-7205
propertyresolution@pnmac.com
www.pennymacusa.com

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. | Contract Sales Price | $ | 1,610,000.00 | 6. | Proceeds Received Date: 09/30/2014 | |
| 2. | Less Total Allowable Closing Costs | $ | 110,000.00 | 7. | Approved Buyer(s): Vahid Osman, M.D. | |
| | a. Commissions | $ | 48,300.00 | | | |
| | b. Settlement Escrow/Attorney Fees | $ | | | | |
| | c. Seller's Title and Escrow Fees | $ | 7,002.50 | 8. | Settlement Agent: | |
| | d. Subordinate Lien Payoff | $ | 10,000.00 | | | |
| | e. Transfer taxes/stamps/recording fees | $ | 1,871.00 | | | |
| | f. Real Property Taxes | $ | 5,134.79 | 9. | Settlement Agent's Address: | |
| | g. HOA Payoff | $ | 7,761.53 | | | |
| | h. Termite Inspection/Repair | $ | | | | |
| | i. Borrower Relocation Assistance | $ | | | | |
| | j. Seller Closing Credit | $ | | | | |
| | k. Other (see below) | $ | 29,930.18 | | | |
| **3.** | **Net Proceeds to Servicer** | $ | **1,500,000.00** | | | |
| 4. | Buyer Contribution | $ | | 10. | Settlement Agent's Office Phone: | |
| 5. | Seller Cash Contribution | $ | | 11. | Settlement Agent's Office Fax: | |

Terms of Short Sale Explanation on Other Costs:

*except for a credit to Buyer for the tenant's deposit and the carve-out to be paid to the Bankruptcy Estate (see 2.k. above) all as disclosed and included in the Bankruptcy sale motion*

Under penalty of perjury you certify that:

A. the sale of the property is an "arm's length" transaction, between parties who are unrelated and unaffiliated by family, marriage, or commercial enterprise;

B. there are no agreements or understandings between you and the Buyer that you will remain in the property as a tenant or later obtain title or ownership of the property;

C. neither you nor the Buyer will receive any funds or commissions from the sale of the property; and

D. there are no agreements or offers relating to the sale or subsequent sale of the property that have not been disclosed to the Servicer.

*Nancy Zamora, Chapter 7 Trustee*
*Bankruptcy Estate of* FAY SAGATI                    7/23/14
                                                        Date                                                            Date

If you have questions, please contact me directly between the hours of 07:00AM and 04:00PM. If you would like to escalate an issue, please contact propertyresolution@pnmac.com

Sincerely,

Sheila Rodriguez
PennyMac Loan Services, LLC
sheila.rodriguez@pnmac.com
818-878-8376

Important Legal Notices

This is an attempt by a debt collector to collect a debt. However, if your account is subject to pending bankruptcy proceedings or if you have received a discharge in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt against you personally.



Property Resolution
6101 Condor Drive
Moorpark, CA 93021
(866)573-9564
*fax* (866) 577-7205
propertyresolution@pnmac.com
www.pennymacusa.com

We are required under state law to notify consumers of the following rights. This list does not contain a complete list of the rights consumers have under state and federal law.

**CALIFORNIA** residents:  As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. We will not submit a negative credit report to a credit reporting agency about this credit obligation until the expiration of the time period described. The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.

**COLORADO** residents:  A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt. FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE www.coloradoattorneygeneral.gov/ca. Our local office is located at 700 17th St, Suite 200, Denver, CO 80202, (866) 436-4766.

**MAINE** residents:  PennyMac Loan Services, LLC operating hours are 6:00 A.M. until 6:00 P.M. Pacific Time Monday through Friday and 7:00 A.M. until 11:00 A.M. Pacific Time Saturday. You may contact our office during business hours by calling (866) 545-9070.

**MASSACHUSETTS** residents: NOTICE OF IMPORTANT RIGHTS: You have the right to make a written or oral request that telephone calls regarding your debt not be made to you at your place of employment. Any such oral request will be valid for only ten days unless you provide written confirmation of the request postmarked or delivered within seven days of such request. You may terminate this request by writing to the creditor.

**MINNESOTA** residents:  This collection agency is licensed by the Minnesota Department of Commerce.

**MONTANA** residents:  The State of Montana, Department of Administration, Division of Banking and Financial Institutions (Division), is the licensing agency of mortgage servicers. Any consumer with a comment, question, or concern should contact the Division by the means listed within this disclosure. State of Montana, Department of Administration, Division of Banking and Financial Institutions, 301 South Park, Suite 316, PO Box 200546, Helena, MT 59620-0546. Phone: 406-841-2920. Fax: 406-841-2930. E-mail: banking@mt.gov. Website: www.banking.mt.gov/mortgage.asp.

**NEW YORK** residents:  This collection agency is licensed by the New York City Department of Consumer Affairs, License Numbers 1294096 and 1467388. This collection agency is licensed by the City of Buffalo, License Number 551910.

**TENNESSEE** residents: This collection agency is licensed by the Collection Service Board, State Department of Commerce and Insurance.

**TEXAS** residents: COMPLAINTS REGARDING THE SERVICING OF YOUR MORTGAGE SHOULD BE SENT TO THE DEPARTMENT OF SAVINGS AND MORTGAGE LENDING, 2601 N. LAMAR, SUITE 201, AUSTIN, TX 78705. A TOLL-FREE CONSUMER HOTLINE IS AVAILABLE AT (877) 276-5550. A complaint form and instructions may be downloaded and printed from the Department's website located at www.sml.texas.gov or obtained from the department upon request by mail at the address above, by telephone at its toll-free consumer hotline listed above, or by email at smlinfo@sml.texas.gov.

**UTAH** residents:  As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. We will not submit a negative credit report to a credit reporting agency about this credit obligation until the expiration of any time period described.

Licensing Information

Equal Housing Opportunity © 2008-2014 PennyMac Loan Services, LLC, 6101 Condor Drive, Suite 200, Moorpark, CA 93021, 818-224-7442. NMLS ID # 35953 (www.nmlsconsumeraccess.org). Trade/service marks are the property of PennyMac Loan Services, LLC and/or its subsidiaries or affiliates. Arizona Mortgage Banker License # 0911088. Licensed by the Department of Business Oversight under the California Residential Mortgage Lending Act. Colorado: Regulated by the Division of Real Estate. Colorado office: 700 17th St, Suite 200, Denver, CO 80202, (866) 436-4766. Georgia Residential Mortgage Licensee #33027. Illinois Department of Financial & Professional Regulation, 320 W Washington St, Springfield, IL 62786, Residential Mortgage Licensee # MB.6760595. Minnesota: This is not an offer to enter into an agreement and an offer may only be made pursuant to Minn. Stat. §47.206 (3) & (4). Licensed by the Mississippi Department of Banking and Consumer Finance. Licensed by the New Hampshire Banking Department. Licensed by the N.J. Department of Banking and Insurance. North Carolina Permit No. 104753. Ohio Mortgage Broker Act Mortgage Banker Exemption # MBMB.850062.000. Rhode Island Lender License # 20092600LL. Washington Consumer Loan License # CL-35953. For a complete listing of state licenses and important notices, please visit www.pennymacusa.com/state-licenses. Some products may not be available in all states. Information, rates and pricing are subject to change without prior notice at the sole discretion of PennyMac Loan Services, LLC. All loan programs subject to borrowers meeting appropriate underwriting conditions. This is not a commitment to lend. Other restrictions apply. All rights reserved.

**This is an attempt by a debt collector to collect a debt. However, if your account is subject to pending bankruptcy proceedings or if you have received a discharge in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt against you personally.**

# EXHIBIT  B

# PROGRESSIVE TITLE COMPANY

425 W. BROADWAY SUITE 300
GLENDALE, CA 91204
PHONE: (800) 311-4549
FAX: (818) 291-4481

DATED AS OF MARCH 20, 2014 AT 7:30 A.M.

**ENCORE ESCROW**
23901 CALABASAS RD. #1033
CALABASAS, CA 91302

ATTENTION: JENICA COHEN-PIVNIK

YOUR NO.: 21641 PCH
PROPERTY ADDRESS: **21641 PACIFIC COAST HWY, MALIBU, CA 90265**

ORDER NO.: PR1480430
TITLE OFFICER: ELLA M. CUMMINGS
EMAIL:
GLENDALEUNIT80@PROGRESSIVETITLE.COM

## "PRELIMINARY REPORT"

IN RESPONSE TO THE ABOVE REFERENCED APPLICATION FOR A POLICY OF TITLE INSURANCE, **PROGRESSIVE TITLE COMPANY** HEREBY REPORTS THAT IT IS PREPARED TO ISSUE, OR CAUSE TO BE ISSUED, AS OF THE DATE HEREOF, A POLICY OR POLICIES OF TITLE INSURANCE DESCRIBING THE LAND AND THE ESTATE OR INTEREST THEREIN HEREINAFTER SET FORTH, INSURING AGAINST LOSS WHICH MAY BE SUSTAINED BY REASON OF ANY DEFECT, LIEN OR ENCUMBRANCE NOT SHOWN OR REFERRED TO AS AN EXCEPTION BELOW OR NOT EXCLUDED FROM COVERAGE PURSUANT TO THE PRINTED SCHEDULES, CONDITIONS AND STIPULATIONS OF SAID POLICY FORMS.

THE PRINTED EXCEPTIONS AND EXCLUSIONS FROM THE COVERAGE OF SAID POLICY OR POLICIES ARE SET FORTH IN EXHIBIT B ATTACHED. THE POLICY TO BE ISSUED MAY CONTAIN AN ARBITRATION CLAUSE. WHEN THE AMOUNT OF INSURANCE IS LESS THAN THAT SET FORTH IN THE ARBITRATION CLAUSE, ALL ARBITRABLE MATTERS SHALL BE ARBITRATED AT THE OPTION OF EITHER THE COMPANY OR THE INSURED AS THE EXCLUSIVE REMEDY OF THE PARTIES. LIMITATIONS ON COVERED RISKS APPLICABLE TO THE CLTA AND ALTA HOMEOWNER'S POLICIES OF TITLE INSURANCE WHICH ESTABLISH A DEDUCTIBLE AMOUNT AND A MAXIMUM DOLLAR LIMIT OF LIABILITY FOR CERTAIN COVERAGES ARE SET FORTH IN THE POLICY. COPIES OF THE POLICY FORMS SHOULD BE READ. THEY ARE AVAILABLE FROM THE OFFICE THAT ISSUED THIS REPORT.

**PLEASE READ THE EXCEPTIONS SHOWN OR REFERRED TO BELOW AND THE EXCEPTIONS AND EXCLUSIONS SET FORTH IN EXHIBIT B OF THIS REPORT CAREFULLY. THE EXCEPTIONS AND EXCLUSIONS ARE MEANT TO PROVIDE YOU WITH NOTICE OF MATTERS WHICH ARE NOT COVERED UNDER THE TERMS OF THE TITLE INSURANCE POLICY AND SHOULD BE CAREFULLY CONSIDERED.**

**IT IS IMPORTANT TO NOTE THAT THIS PRELIMINARY REPORT IS NOT A WRITTEN REPRESENTATION AS TO THE CONDITION OF TITLE AND MAY NOT LIST ALL LIENS, DEFECTS AND ENCUMBRANCES AFFECTING TITLE TO THE LAND.**

THIS REPORT (AND ANY SUPPLEMENTS OR AMENDMENTS HERETO) IS ISSUED SOLELY FOR THE PURPOSE OF FACILITATING THE ISSUANCE OF A POLICY OF TITLE INSURANCE AND NO LIABILITY IS ASSUMED HEREBY. IF IT IS DESIRED THAT LIABILITY BE ASSUMED PRIOR TO THE ISSUANCE OF A POLICY OF TITLE INSURANCE, A BINDER OR COMMITMENT SHOULD BE REQUESTED.

THE FORM OF POLICY OF TITLE INSURANCE CONTEMPLATED BY THIS REPORT IS:

[X]    CALIFORNIA LAND TITLE ASSOCIATION/AMERICAN LAND TITLE ASSOCIATION
         HOMEOWNERS POLICY

[X]    AMERICAN LAND TITLE ASSOCIATION LOAN POLICY

[ ]    CALIFORNIA LAND TITLE ASSOCIATION STANDARD POLICY

[ ]    AMERICAN LAND TITLE ASSOCIATION RESIDENTIAL POLICY

ORDER NO. PR1480430

## SCHEDULE A

THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

**A FEE**

TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

**JOSEPH SAGATI AND FAY SAGATI, HUSBAND AND WIFE AS JOINT TENANTS**

THE LAND REFERRED TO IN THIS REPORT IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**SEE EXHIBIT "A" ATTACHED HERETO**

ORDER NO. PR1480430

## EXHIBIT "A"

LOTS 109 AND 110 OF TRACT NO. 10570, IN THE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 161 PAGES 36 TO 42 INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW THE SURFACE OF SAID LAND, BUT WITH NO RIGHT OF SURFACE ENTRY, AS PROVIDED IN DEED RECORDED IN BOOK 19246, PAGE 278, OFFICIAL RECORDS.

***END OF LEGAL DESCRIPTION***

ORDER NO. PR1480430

## SCHEDULE B

AT THE DATE HEREOF EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM DESIGNATED ON THE FACE PAGE OF THIS REPORT WOULD BE AS FOLLOWS:

A.  GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR 2014-2015, A LIEN NOT YET DUE OR PAYABLE.

B.  GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR 2013-2014

|  |  |  |
|---|---|---|
| TOTAL: | $20,769.95 | |
| FIRST INSTALLMENT: | $10,384.98 | PAID |
| PENALTY: | $0.00 | |
| SECOND INSTALLMENT: | $10,384.97 | OPEN |
| PENALTY: | $0.00 | |

| | |
|---|---|
| ASSESSED VALUATION: | |
| LAND VALUE: | $1,403,617.00 |
| IMPROVEMENTS: | $350,902.00 |
| EXEMPTION: | $0.00 |

| | |
|---|---|
| CODE AREA: | 10865 |
| A. P. NO.: | 4451-017-027 |

C.  THE LIEN OF SUPPLEMENTAL TAXES ASSESSED PURSUANT TO CHAPTER 3.5 COMMENCING WITH SECTION 75 OF THE CALIFORNIA REVENUE AND TAXATION CODE.

1.  WATER RIGHTS, CLAIMS OR TITLE TO WATER, WHETHER OR NOT SHOWN BY THE PUBLIC RECORDS.

2.  AN EASEMENT FOR PURPOSES STATED AND INCIDENTAL RIGHTS.

|  |  |
|---|---|
| FOR: | TELEPHONE AND ELECTRIC LIGHT, HEAT AND POWER SERVICE |
| RECORDED: | IN BOOK 10242 PAGE 124, OFFICIAL RECORDS |
| | |
| AFFECTS: | AS MORE PARTICULARLY DESCRIBED THEREIN |

3.  THE PRIVILEGE AND RIGHT TO EXTEND AND MAINTAIN DRAINAGE STRUCTURES AND EXCAVATION AND EMBANKMENT SLOPES BEYOND THE LIMITS OF THE STATE HIGHWAY ADJOINING SAID LOT, WHERE REQUIRED FOR THE CONSTRUCTION AND MAINTENANCE THEREOF BY INSTRUMENT RECORDED IN BOOK 15228, PAGE 342, OF OFFICIAL RECORDS.

4.  COVENANTS, CONDITIONS, AND RESTRICTIONS, BUT DELETING ANY COVENANT, CONDITION OR RESTRICTION INDICATING A PREFERENCE, LIMITATION OR DISCRIMINATION BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS, NATIONAL ORIGIN, SEXUAL ORIENTATION, MARITAL STATUS, ANCESTRY, SOURCE OF INCOME OR DISABILITY, TO THE EXTENT SUCH COVENANTS, CONDITIONS OR RESTRICTIONS VIOLATE TITLE 42, SECTION 3604(C), OF THE UNITED STATES CODES OR SECTION 12955 OF THE CALIFORNIA GOVERNMENT CODE.  LAWFUL RESTRICTIONS UNDER STATE AND FEDERAL LAW ON THE AGE OF OCCUPANTS IN SENIOR HOUSING OR HOUSING FOR OLDER PERSONS SHALL NOT BE CONSTRUED AS RESTRICTIONS BASED ON FAMILIAL STATUS.

|  |  |
|---|---|
| RECORDED: | IN BOOK 8196 PAGE 225, OFFICIAL RECORDS |

4

ORDER NO. PR1480430

5.  AN EASEMENT FOR PURPOSES STATED AND INCIDENTAL RIGHTS.

      FOR:                TELEPHONE, TELEGRAPH, ELECTRIC LIGHT AND POWER LINES, CONDUITS

      RECORDED:      IN BOOK 19246 PAGE 278, OFFICIAL RECORDS

      AFFECTS:      AS MORE PARTICULARLY DESCRIBED THEREIN

6.  COVENANTS, CONDITIONS AND RESTRICTIONS, WHICH PROVIDE THAT A VIOLATION THEREOF SHALL NOT DEFEAT OR RENDER INVALID THE LIEN OF ANY FIRST MORTGAGE OR DEED OF TRUST MADE IN GOOD FAITH AND FOR VALUE, BUT DELETING ANY COVENANT, CONDITION OR RESTRICTION INDICATING A PREFERENCE, LIMITATION OR DISCRIMINATION BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS, NATIONAL ORIGIN, SEXUAL ORIENTATION, MARITAL STATUS, ANCESTRY, SOURCE OF INCOME OR DISABILITY, TO THE EXTENT SUCH COVENANTS, CONDITIONS OR RESTRICTIONS VIOLATE TITLE 42, SECTION 3604(C), OF THE UNITED STATES CODES OR SECTION 12955 OF THE CALIFORNIA GOVERNMENT CODE.  LAWFUL RESTRICTIONS UNDER STATE AND FEDERAL LAW ON THE AGE OF OCCUPANTS IN SENIOR HOUSING OR HOUSING FOR OLDER PERSONS SHALL NOT BE CONSTRUED AS RESTRICTIONS BASED ON FAMILIAL STATUS.

      RECORDED:      IN BOOK 19246 PAGE 278, OFFICIAL RECORDS

7.  AN EASEMENT AS SHOWN ON THE MAP OF SAID TRACT .

      FOR:                STORM DRAIN AND INCIDENTAL PURPOSES

      AFFECTS:      THAT PORTION OF SAID LAND AS SHOWN ON THE MAP OF SAID TRACT

8.  A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND COVENANT AND AGREE THAT SAID LAND SHALL BE HELD AS ONE PARCEL AND NO PORTION SHALL BE SOLD SEPARATELY, WHICH COVENANT IS TO RUN WITH THE LAND AND BE BINDING UPON FUTURE OWNERS.

      RECORDED:      NOVEMBER 8, 1989 AS INSTRUMENT NO. 89-1802723, OFFICIAL RECORDS

9.  **A FINANCING STATEMENT**

      **DEBTOR:**             **SOUTHWEST ENGINEERING, INC. / JOSEPH YOUSSEF SAQATI**
      **SECURED PARTY:**  **WELLS FARGO BANK, N A**
      **RECORDED:**      **JUNE 22, 2006 AS INSTRUMENT NO. 06-1374876, OFFICIAL RECORDS**

**A CONTINUATION STATEMENT WAS RECORDED JANUARY 4, 2011 AS INSTRUMENT NO. 20110009860, OFFICIAL RECORDS.**

ORDER NO. PR1480430

**10. A DEED OF TRUST TO SECURE AN ORIGINAL INDEBTEDNESS AND ANY OTHER
AMOUNTS OR OBLIGATIONS SECURED THEREBY**

| | |
|---|---|
| AMOUNT: | $1,440,000.00 |
| DATED: | JULY 31, 2006 |
| TRUSTOR: | FAY SAGATI, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY |
| TRUSTEE: | CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP |
| BENEFICIARY: | WASHINGTON MUTUAL BANK, FA, A FEDERAL SAVINGS BANK |
| RECORDED: | AUGUST 8, 2006 AS INSTRUMENT NO. 06-1755274, OFFICIAL RECORDS |
| LOAN NO.: | |

A NOTICE OF DEFAULT RECORDED JANUARY 6, 2009 AS INSTRUMENT NO.
20090016080, OFFICIAL RECORDS.

ACCORDING TO THE PUBLIC RECORDS, THE BENEFICIAL INTEREST UNDER THE DEED
OF TRUST HAS BEEN ASSIGNED BY MESNE ASSIGNMENTS, THE LAST HAVING
ASSIGNED SAID INTEREST TO

| | |
|---|---|
| ASSIGNEE: | PENNYMAC MORTGAGE INVESTMENT TRUST HOLDINGS I, LLC |
| RECORDED: | OCTOBER 31, 2013 AS INSTRUMENT NO. 20131556341, OFFICIAL RECORDS. |

A DOCUMENT RECORDED JANUARY 22, 2014 AS INSTRUMENT NO. 20140066948,
OFFICIAL RECORDS, PURPORTEDLY SUBSTITUTES ALAW AS TRUSTEE UNDER THE
DEED OF TRUST.

A NOTICE OF TRUSTEE'S SALE RECORDED FEBRUARY 4, 2014 AS INSTRUMENT NO.
20140120077, OFFICIAL RECORDS.

PLEASE NOTE: IF THIS  LOAN IS TO BE PAID AS A SHORT PAY, PLEASE CONTACT
THIS OFFICE FOR ADDITIONAL REQUIREMENTS AT LEAST TEN DAYS PRIOR TO
CLOSING.

**11. AN ABSTRACT OF JUDGMENT**

| | |
|---|---|
| COURT: | SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES |
| CASE NO.: | SC104274 |
| DEBTOR: | SOUTHWEST ENGINEERING, INC., JOSEPH SAGATI AKA JOSEPH FOROUGH SAGATI AKA JOSEPH SACATI AKA YOUSSEF SAGATI AKA YOUSSEF FOROUGH SAGATI, AN INDIVIDUAL |
| CREDITOR: | COLONIAL PACIFIC LEASING CORPORATION |
| AMOUNT: | $176,069.17, AND ANY OTHER AMOUNTS DUE THEREUNDER. |
| RECORDED: | JULY 13, 2010 AS INSTRUMENT NO. 20100955716, OFFICIAL RECORDS |

12. ANY DEFECTS, LIENS, ENCUMBRANCES OR OTHER MATTERS WHICH NAME PARTIES WITH THE
SAME OR SIMILAR NAMES AS THE VESTEE(S).

ORDER NO. PR1480430

## REQUIREMENTS:

**13.** **PRIOR TO THE ISSUANCE OF ANY POLICY OF TITLE INSURANCE, THE COMPANY WILL REQUIRE:**

**A.** **THE NAME SEARCH NECESSARY TO ASCERTAIN THE EXISTENCE OF MATTERS REFERRED TO IN ITEM NO. 12 HAS NOT BEEN COMPLETED. IN ORDER TO COMPLETE THIS PRELIMINARY REPORT OR COMMITMENT, WE WILL REQUIRE A STATEMENT OF INFORMATION.**

**IMPORTANT: PLEASE FORWARD THE STATEMENT OF INFORMATION TO US AS SOON AS POSSIBLE, BUT NO LATER THAN 10 WORKING DAYS BEFORE CLOSING. THIS WILL HELP TO AVOID ANY LAST MINUTE DELAYS WITH YOUR CLOSING AND RECORDING.**

**\*\*\*END OF SCHEDULE B\*\*\***

ORDER NO. PR1480430

# NOTES:

WE DEPOSIT FUNDS RECEIVED ON YOUR BEHALF IN STATE OR FEDERALLY-CHARTERED BANKS THAT ARE INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"). THE ACCOUNT IS CURRENTLY HELD AT COMERICA BANK.

FDIC DEPOSIT INSURANCE COVERAGE APPLIES TO A MAXIMUM AMOUNT OF $250,000 PER DEPOSITOR FOR DEPOSITS HELD IN THE SAME LEGAL OWNERSHIP CATEGORY AT EACH BANK. FOR EXAMPLE, FUNDS HELD ON YOUR BEHALF IN AN ACCOUNT MAINTAINED BY US WILL BE COMBINED WITH ANY INDIVIDUAL ACCOUNTS HELD DIRECTLY BY YOU AT THE SAME BANK. YOU ARE RESPONSIBLE FOR MONITORING THE TOTAL AMOUNT OF DEPOSITS THAT ARE OWNED DIRECTLY OR INDIRECTLY BY YOU IN ANY ONE BANK.

IF YOU HAVE QUESTIONS ABOUT FDIC DEPOSIT INSURANCE, CONTACT YOUR FINANCIAL OR LEGAL ADVISORS OR GO TO HTTP://WWW.FDIC.GOV/DEPOSIT/DEPOSITS/INDEX.HTML. WE DO NOT GUARANTEE THE SOLVENCY OF ANY BANK INTO WHICH FUNDS ARE DEPOSITED AND WE ASSUME NO LIABILITY FOR ANY LOSS YOU INCUR DUE TO THE FAILURE, INSOLVENCY OR SUSPENSION OF OPERATIONS OF ANY BANK OR THE $250,000 FDIC DEPOSIT INSURANCE LIMIT.

UNLESS OTHERWISE AGREED IN WRITING, EACH OF THE PRINCIPALS AGREES, UNDERSTANDS AND ACKNOWLEDGES THAT: THE ESCROW ACCOUNT IS NON-INTEREST-BEARING; NO FINANCIAL OR OTHER BENEFITS WILL BE EARNED BY OR PROVIDED TO ANY OF THE PRINCIPALS WITH RESPECT TO SUCH FUNDS' AND PROGRESSIVE TITLE COMPANY AND ITS AFFILIATES MAY INSTEAD RECEIVE DIRECT AND INDIRECT FINANCIAL AND OTHER BENEFITS FROM THE DEPOSITORY WITH RESPECT TO SUCH FUNDS THESE BENEFITS SHALL BE TREATED AS ADDITIONAL COMPENSATION TO PROGRESSIVE TITLE COMPANY FOR ITS SERVICES AS AN ESCROW HOLDER IN THIS TRANSACTION.

**NOTE:** UNLESS OTHERWISE DIRECTED IN WRITING, PROGRESSIVE TITLE COMPANY AUTOMATICALLY ISSUES THE **ALTA HOME OWNER'S POLICY** ON ALL QUALIFYING RESIDENTIAL PROPERTY SALE TRANSACTIONS.

**NOTE:** THIS COMPANY REQUIRES CURRENT BENEFICIARY DEMANDS PRIOR TO CLOSING. NO PAYOFFS WILL BE MADE USING "VERBAL" FIGURES

**NOTE:** EFFECTIVE JANUARY 1, 1990, ASSEMBLY BILL 512, ENACTED AS CHAPTER 598, WILL ADD SECTION 12413.1 TO THE CALIFORNIA INSURANCE CODE DEALING WITH THE "GOOD FUNDS" ISSUE. FUNDS DEPOSITED BY:

- CASH AND BY ELECTRONIC TRANSFER (WIRED FUNDS) WILL BE AVAILABLE FOR SAME DAY DISBURSEMENTS.
- CASHIER'S CHECKS, CERTIFIED CHECKS AND TELLER'S CHECKS WILL BE AVAILABLE FOR NEXT DAY DISBURSEMENTS.
- ALL OTHER TYPES OF CHECKS WILL NOT BE AVAILABLE FOR DISBURSEMENT UNTIL THE DAY PROVIDED IN REGULATION CC ADOPTED BY THE FEDERAL RESERVE BOARD OF GOVERNORS.
- A DRAFT WILL NOT BE AVAILABLE FOR DISBURSEMENT UNTIL THE DRAFT HAS BEEN SUBMITTED FOR COLLECTION AND PAYMENT RECEIVED BY OUR BANK.

**PLEASE NOTE:** THIS COMPANY WILL MAKE DISBURSEMENTS ONLY IN THE SAME MANNER AS WHICH FUNDS ARE RECEIVED. SHOULD THIS COMPANY BE REQUESTED TO MAKE ANY DISBURSEMENTS BY ELECTRONIC TRANSFER (WIRED FUNDS), THIS COMPANY WILL REQUIRE FUNDS TO BE DEPOSITED TO OUR ACCOUNT BY ELECTRONIC TRANSFER.

ORDER NO. PR1480430

# PROGRESSIVE TITLE COMPANY

425 W. BROADWAY SUITE 300
GLENDALE, CA 91204
PHONE: (800) 311-4549
FAX: (818) 291-4481

### WIRE TRANSFER INSTRUCTIONS

**PROGRESSIVE TITLE COMPANY**
**PR1480430**

**COMERICA BANK**
**2321 ROSECRANS AVENUE,# 5000**
**EL SEGUNDO,CA 90245**

**ABA # 121137522**
**CREDIT:  PROGRESSIVE TITLE COMPANY – (PR1480430, ELLA M. CUMMINGS)**
**ACCOUNT # 1892380336**

SHOULD YOUR WIRE INSTRUCTION BE INCOMPLETE OR INCORRECT, IT WILL BE RETURNED
WITHOUT NOTICE.

IF YOU HAVE ANY QUESTIONS IN THIS REGARD PLEASE CONTACT YOUR TITLE OFFICER
IMMEDIATELY.

ORDER NO. PR1480430

# PROGRESSIVE TITLE COMPANY
425 W. BROADWAY SUITE 300
GLENDALE, CA 91204
PHONE:  (800) 311-4549

YOUR NO.:
OUR NO.:    PR1480430
DATE:  MARCH 20, 2014 AT 7:30 A.M.

ELLA M. CUMMINGS, TITLE OFFICER

### LENDERS SUPPLEMENTAL REPORT

THE ABOVE NUMBERED REPORT (INCLUDING ANY SUPPLEMENTS OR AMENDMENTS THERETO) IS HEREBY MODIFIED AND/OR SUPPLEMENTED IN ORDER TO REFLECT THE FOLLOWING ADDITIONAL ITEMS RELATING TO THE ISSUANCE OF AN AMERICAN LAND TITLE ASSOCIATION LOAN FORM POLICY AS FOLLOWS:

THIS REPORT IS PREPARATORY TO THE ISSUANCE OF AN ALTA LOAN POLICY.  WE HAVE NO KNOWLEDGE OF ANY FACT WHICH WOULD PRECLUDE THE ISSUANCE OF THE POLICY WITH CLTA ENDORSEMENT FORMS 100 AND 116 ATTACHED.

WHEN ISSUED, THE CLTA ENDORSEMENT FORM 116 WILL REFERENCE A **SINGLE FAMILY RESIDENCE**

KNOWN AS

**21641 PACIFIC COAST HIGHWAY, IN THE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA**

ACCORDING TO THE PUBLIC RECORDS, THERE HAVE BEEN NO DEEDS CONVEYING THE LAND DESCRIBED HEREIN WITHIN A PERIOD OF TWENTY-FOUR (24) MONTHS PRIOR TO THE DATE OF THIS REPORT, EXCEPT AS FOLLOWS:

NONE.

ORDER NO. PR1480430

Branch :P02,User :PCAD        Order: PR1480430  Title Officer: 80   Comment:        Station Id :UDSZ



LOS ANGELES,CA
Document: ASSESSOR_MAP 4451.017

Page 1 of 1

Printed on 3/31/2014 9:34:19 AM

## Statement of Information

PROGRESSIVE TITLE COMPANY maintains procedural safeguards that comply with federal standards to protect the confidentiality and security of non-public personal information. This statement will serve to establish identity, eliminate matters affecting persons of similar name, protect you against forgeries, and speed the completion of your title and escrow services. PLEASE BE SURE YOU HAVE FILLED THIS FORM OUT COMPLETELY; INCLUDING SIGNATURES AND DATE. NOT PROVIDING REQUESTED INFORMATION MAY CAUSE A DELAY IN THE CLOSE OF YOUR TRANSACTION. - THANK YOU -
FOR ONLINE VERSION OF THIS FORM CLICK HERE          FOR MORE INFORMATION ON THIS FORM CLICK HERE

ESCROW NO._____  TITLE ORDER: PR1480430

NAME_____  SOC.SEC. NUMBER_____
FIRST          FULL MIDDLE NAME          LAST          DRIVER'S LICENSE NUMBER_____

DATE OF BIRTH_____BIRTHPLACE_____HOME PHONE_____

YOUR BUSINESS PHONE_____YOUR CELL PHONE_____YOUR FAX_____

YOUR E-MAIL_____SPOUSE/DOMESTIC PARTNER E-MAIL_____

LIVED IN USA SINCE_____  LIVED IN CALIFORNIA SINCE_____

(CIRCLE ONE) NAME OF SPOUSE/ DOMESTIC PARTNER_____  SOC. SEC. NUMBER_____
FIRST          FULL MIDDLE NAME          LAST          DRIVER'S LICENSE NUMBER_____

DATE OF BIRTH_____BIRTHPLACE_____MAIDEN NAME_____

SPOUSE/DOMESTIC PARTNER BUSINESS PHONE_____CELL PHONE_____FAX_____

LIVED IN USA SINCE_____  LIVED IN CALIFORNIA SINCE_____

IF MARRIED, OR IN A DOMESTIC PARTNERSHIP, DATE: _____AT_____
CITY AND STATE

PREVIOUS MARRIAGE(S) OR DOMESTIC PARTNERSHIP(S) (if no previous marriage or domestic partnership, write "NONE"):

(CIRCLE ONE)  NAME OF FORMER          DECEASED          DATE_____
SPOUSE/DOMESTIC PARTNER_____  DIVORCED          WHERE_____
(CIRCLE ONE)  NAME OF FORMER          DECEASED          DATE_____
SPOUSE/DOMESTIC PARTNER_____  DIVORCED          WHERE_____
(ATTACH ADDITIONAL PAGE, IF NECESSARY)

CHILDREN:
NAME_____ DATE OF BIRTH_____ NAME_____ DATE OF BIRTH_____

NAME_____ DATE OF BIRTH_____ NAME_____ DATE OF BIRTH_____
(ATTACH ADDITIONAL PAGE, IF NECESSARY)

INFORMATION COVERING PAST 10 YEARS.

Residence:

| | NUMBER AND STREET | CITY | ZIP CODE | FROM | TO |
|---|---|---|---|---|---|
| | NUMBER AND STREET | CITY | ZIP CODE | FROM | TO |
| Your Employment: | NUMBER AND STREET | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| Spouse/Domestic Partner Employment: | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |

HAVE YOU OR YOUR SPOUSE/DOMESTIC PARTNER OWNED OR OPERATED A BUSINESS?

☐ YES    ☐ NO    IF SO, PLEASE LIST NAMES_____

I HAVE NEVER BEEN ADJUDGED BANKRUPT, NOR ARE THERE ANY UNSATISFIED JUDGMENTS OR OTHER MATTERS PENDING AGAINST ME WHICH MIGHT AFFECT MY TITLE TO THIS PROPERTY EXCEPT AS FOLLOWS:

_____

THE STREET ADDRESS OF THE PROPERTY IN THIS TRANSACTION IS: 21641 PACIFIC COAST HWY
The undersigned declare, under penalty of perjury, that the foregoing is true and correct.

Date:_____    X_____
(SIGNATURE)

Date:_____    X_____
(SPOUSE/DOMESTIC PARTNER SIGNATURE)

# PROGRESSIVE TITLE COMPANY

# PRIVACY POLICY

## We are Committed to Safeguarding Customer Information

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information – particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, we have adopted this Privacy Policy to govern the use and handling of your personal information.

## Applicability

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity.

## Types of Information

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;

- Information about your transactions with us, our affiliated companies, or others; and

- Information we receive from a consumer reporting agency.

## Use of Information

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and companies involved in real estate services, such as home warranty companies.

## Former Customers

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

## Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to help ensure that your information will be handled responsibly and in accordance with this Privacy Policy. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

G-L-B Privacy Policy / #47

## PROGRESSIVE TITLE COMPANY

### Available Discounts

PROGRESSIVE TITLE COMPANY is pleased to inform you that upon proper qualification, there are premium discounts available upon the purchase of title insurance covering improved property with a one to four family residential dwelling. Such discounts could apply to:

- Property located within an area proclaimed a state or federal disaster area
- Property purchased from a foreclosing beneficiary or successful bidder at a foreclosure sale
- Property being refinanced

Please talk with your title officer to determine your qualification for any of these discounts.

## EXHIBIT B
## LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (By Policy Type)

### 1. CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY – 1990
### SCHEDULE B
### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notice of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof, (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable "doing business" laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by their policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### 2. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
### WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy ( except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or the extent insurance is afforded herein as to assessments for street improvements under construction or completed at date of policy); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable "doing business" laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
      (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
      (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
   (a) to timely record the instrument of transfer; or
   (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

### 3. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
### WITH REGIONAL EXCEPTIONS

When the American Land Title Association Policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy, the exclusions set forth in paragraph 6 above are used and the following exceptions to coverage appear in the policy.

### SCHEDULE B

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

**4. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992**
**EXCLUSIONS FROM COVERAGE**
The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees ore expenses which arise by reason of:

1.  (a)  Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or related to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3.  Defects, liens, encumbrances, adverse claims, or other matters:
    (a)  created, suffered, assumed or agreed to by the insured claimant;
    (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became insured under this policy;
    (c)  resulting in no loss or damage to the insured claimant;
    (d)  attaching or created subsequent to Date of Policy; or
    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4.  Any claim, which arises out of the transaction vesting in the insured estate  or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
    (i)  the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
    (ii)  the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
    (a)  to timely record the instrument of transfer; or
    (b)  of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

**5. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992**
**WITH REGIONAL EXCEPTIONS**
When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 8 above are used and the following exceptions to coverage appear in the policy

**SCHEDULE B**
This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
Part One
1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3.  Easements, claims of easement or encumbrances which are not shown by the public records.
4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5.  Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6.  Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

**6. CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE – 2003**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE – 2003**
Covered Risks 16 (Subdivision Law Violation), 18 (Building Permit), 19 (Zoning) and 21 (Encroachment of boundary walls or fences) are
subject to Deductible Amounts and Maximum Dollar Limits of Liability
**EXCLUSIONS**
In addition to the exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1.  Governmental police power, and the existence or violation of any law or government regulation.  This includes building and zoning ordinances and also laws and regulations concerning:
    (a)  building
    (b)  zoning
    (c)  land use;
    (d)  improvements on the land
    (e)  land division
    (f)  environmental protection.
    This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
    This exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.
2.  The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.
3.  The right to take the land by condemning it, unless:
    (a)  a notice of exercising the right appears in the public records on the Policy Date; or
    (b)  the taking happened before the Policy Date and is binding on You if You bought the land without Knowing of the taking.
4.  Risks
    (a)  that are created, allowed, or agreed to by You, whether  or not they appear in the Public Records;
    (b)  that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
    (c)  that result in no loss to You; or
    (d)  that first occur after the Policy Date – this does not limit the coverage described in Covered Risk 7, 8 d, 22, 23, 24 or 25.
5.  Failure to pay value for Your Title.
6.  Lack of a right:
    (a)  to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    (b)  in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage in Covered Risk 11 or 18.

**7. ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)**
**EXCLUSIONS FROM COVERAGE**
The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:
1.      (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.
        (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.
2.      Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.
3.      Defects, liens, encumbrances, adverse claims or other matters:
        (a) created, suffered, assumed or agreed to by the Insured Claimant;
        (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
        (c) resulting in no loss or damage to the Insured Claimant;
        (d) attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or
        (e) resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.      Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.
5.      Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.
6.      Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy.  This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.
7.      Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.
8.      Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:
        (a)     The time of the advance; or
        (b)     The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of Interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.
9.      The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.

**8. 2006 ALTA LOAN POLICY (06-17-06)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)      the occupancy, use, or enjoyment of the Land;
   (ii)     the character, dimensions, or location of any improvement erected on the Land;
   (iii)    the subdivision of land; or environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

**9. 2006 ALTA LOAN POLICY (06-17-06)**
**WITH REGIONAL EXCEPTIONS**

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 8 above are used and the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
Part One:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

**10. 2006 ALTA OWNER'S POLICY (06-17-06)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

**11. 2006 ALTA OWNER'S POLICY (06-17-06)**
**WITH REGIONAL EXCEPTIONS**

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 8 above are used and the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
Part One:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

# EXHIBIT  C

# Encore Escrow

## Encore Escrow Company Inc.

23901 Calabasas Rd., #1033, Calabasas, CA 91302

(818) 224-2788 • Fax: (818) 224-2789

## SELLER'S ESTIMATED NET PROCEEDS

| | |
|---|---|
| **PROPERTY:** | 21641 Pacific Coast Highway<br>Malibu, CA |
| **SELLER:** | Bankruptcy Estate of Fay Sagati |

| | |
|---|---|
| **DATE:** | July 16, 2014 |
| **CLOSING DATE:** | September 30, 2014 |
| **ESCROW NO.:** | 13685-JP |

| | DEBITS | CREDITS |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 1,610,000.00 |
| | | |
| **PAYOFF CHARGES - Pennymac** | | |
| **[Total Payoff $1,500,000.00]** | | |
| Rough estimate | 1,500,000.00 | |
| | | |
| **PAYOFF CHARGES - Colonial Pacific Leasing Corporation** | | |
| **[Total Payoff $10,000.00]** | | |
| Settlement | 10,000.00 | |
| | | |
| **PAYOFF CHARGES - Bankruptcy Estate for 506(c) expenses** | | |
| **[Total Payoff $20,330.18]** | | |
| 506(c) expenses | 20,330.18 | |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| Taxes 1st Half 14-15 at $10384.97/semi-annually from 07/01/2014 to 09/30/2014 | 5,134.79 | |
| Security Deposit/Prepaid rent transfer | 9,600.00 | |
| | | |
| **COMMISSION CHARGES** | | |
| Rodeo Realty, Inc. | 48,300.00 | |
| | | |
| **H.O.A./MANAGEMENT** | | |
| Transfer Fee to Malibu La Costa HOA | 200.00 | |
| Estimate for Past due assessments to Malibu La Costa HOA | 7,561.53 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES - Progressive Title Company** | | |
| Owners Title Policy | 3,210.00 | |
| Sub Escrow Fee | 62.50 | |
| Est Title Wire/Insp Fee | 95.00 | |
| Recording Order | 100.00 | |
| Documentary Transfer Tax | 1,771.00 | |
| | | |
| **ESCROW CHARGES - Encore Escrow Company, Inc.** | | |
| Escrow Fee | 3,420.00 | |
| Processing Demands & HOA $50 each | 100.00 | |
| Drawing Grant Deed | 50.00 | |
| Handling & Storage Fee | 65.00 | |
| | | |
| **TOTAL** | $ 1,610,000.00 | $ 1,610,000.00 |

## THIS IS AN ESTIMATE ONLY AND FIGURES ARE SUBJECT TO CHANGE

**\*NOTICE OF PRELIMINARY ESTIMATE:** THIS IS AN ESTIMATE OF ESCROW AND TITLE FEES ONLY. THIS ESTIMATE IS BASED ON THE BUYER OBTAINING ONLY ONE NEW LOAN. *IN THE EVENT THE BUYER OBTAINS SECONDARY FINANCING IN ADDITION, THIS ESTIMATE WILL BE DEEMED NULL AND VOID.* This estimate is not to be used to inform Borrower of funds required from Borrower to close OR refund due Borrower upon the close of escrow. Upon escrow holders receipt of actual loan documents, escrow shall prepare an updated estimate, reflecting an accurate figure for the Borrower.

| A. SETTLEMENT STATEMENT    U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | | | | |
|---|---|---|---|---|
| ESTIMATED | | | | |

| B. Type of Loan | | | | OMB No. 2502 0265 |
|---|---|---|---|---|
| 1. []FHA  2. []FmHA  3. []Conv. Unins.<br>4. []VA  5. []Conv. Ins. | 6. File Number<br>13685-JP | | 7. Loan Number | Mortgage Insurance Number |

C. Note:  THIS NOTE IS FURNISHED TO GIVE YOU A STATEMENT OF THE ACTUAL SETTLEMENT COSTS. AMOUNTS PAID TO ANY AND BY THE SETTLEMENT AGENT ARE SHOWN. ITEMS MARKED "(P.O.C.)" WERE PAID OUTSIDE OF THE CLOSING. THEY ARE SHOWN HERE FOR INFORMATION PURPOSES AND ARE NOT INCLUDED IN THE TOTALS.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| Vahid Osman, M.D. | Bankruptcy Estate of Fay Sagati<br><br>, CA | |

| G. PROPERTY LOCATION | H. Settlement Agent | |
|---|---|---|
| 21641 Pacific Coast Highway<br>Malibu, CA | Encore Escrow Company, Inc. | |
| | Place of Settlement<br><br>23901 Calabasas Rd., #1033<br>Calabasas, CA 91302 | I. Settlement Date<br>September 30, 2014 |

| J. SUMMARY OF BORROWER'S TRANSACTIONS | | K. SUMMARY OF SELLER'S TRANSACTIONS | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract Sales Price | | 401. Contract sales price | 1,610,000.00 |
| 102. Personal Property | | 402. Personal property | |
| 103. Settl. Chrgs. to Borrower (line 1400) | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/Town Taxes | | 406. City/Town taxes | |
| 107. County Taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross Amount Due From Borrower | | 420. Gross Amount Due to Seller | 1,610,000.00 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| 201. Deposits or Earnest Money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settl. chrgs. to seller (line 1400) | 64,935.03 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Pennymac | 1,500,000.00 |
| 205. | | 505. Colonial Pacific Leasing Corporation | 10,000.00 |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. Bankruptcy Estate for 506(c) expenses | 20,330.18 |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/Town taxes | | 510. City/Town taxes | |
| 211. County taxes | | 511. Taxes 1st Half 14-15 at $10384.97/semi-annually from 07/01/2014 to 09/30/2014 | 5,134.79 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. Security Deposit/Prepaid rent transfer | 9,600.00 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | | 520. Total Reductions in Amount Due Seller | 1,610,000.00 |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER | | 600. CASH AT SETTLEMENT FROM/TO SELLER | |
| 301. Gross Amounts due from Borrower (line 120) | | 601. Gross amount due to Seller (line 420) | 1,610,000.00 |
| 302. Less amounts paid by/for Borrower (line 220) | | 602. Less reductions in amount due Seller (line 520) | 1,610,000.00 |
| 303. CASH TO BORROWER | | 603. CASH FROM SELLER | |

Certified to be a
true & correct copy
of the original

**L. SETTLEMENT STATEMENT**

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| **700. TOTAL SALES/BROKER'S COMMISSION** | | |
| Based on price $1,610,000.00 @ 3.000% | | |
| 701. Rodeo Realty, Inc. $48,300.00 | | |
| 702. | | |
| 703. Commission paid at settlement | | 48,300.00 |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan origination fee | | |
| 802. Loan discount | | |
| 803. Appraisal fee | | |
| 804. Credit report | | |
| 805. Lender's inspection fee | | |
| 806. Mortgage insurance application fee | | |
| 807. Assumption fee | | |
| 808. | | |
| 809. | | |
| 810. | | |
| 811. | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest | | |
| 902. Mortgage insurance | | |
| 903. Hazard insurance | | |
| 904. Flood insurance | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard insurance | | |
| 1002. Mortgage insurance | | |
| 1003. City property taxes | | |
| 1004. County property taxes | | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Reserves | | |
| 1009. | | |
| **1100. ESCROW AND TITLE CHARGES** | | |
| 1101. Escrow Fee to Encore Escrow Company, Inc. | | 3,420.00 |
| 1102. Abstract or title search | | |
| 1103. Title examination | | |
| 1104. Title insurance binder | | |
| 1105. Document preparation | | |
| 1106. Notary fees | | |
| 1107. Attorney's fees | | |
| 1108. Title Insurance to Progressive Title Company | | 3,210.00 |
| 1109. Lender's coverage | | |
| 1110. Owner's coverage $ @ $3,210.00 | | |
| 1111. Sub Escrow Fee to Progressive Title Company | | 62.50 |
| 1112. Est Title Wire/Insp Fee to Progressive Title Company | | 95.00 |
| 1113. Additl. Items See Page #3 | | 215.00 |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording Fees; Releases $100.00 to Progressive Title Company | | 100.00 |
| 1202. City/County tax stamps | | |
| 1203. Documentary Transfer Tax to Progressive Title Company | | 1,771.00 |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey | | |
| 1302. Pest inspection | | |
| 1303. | | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. Additl. Items See Page #3 | | 7,761.53 |
| **1400. TOTAL SETTLEMENT CHARGES (ENTER ON LINES 103 SECTION J AND 502, SECTION K)** | | 64,935.03 |

Certified to be a
true & correct copy

**PAYOFF BREAKDOWN(S)**

Payoff to Pennymac
TOTAL $1,500,000.00
Rough estimate                                                1,500,000.00

Payoff to Colonial Pacific Leasing Corporation
TOTAL $10,000.00
Settlement                                                      10,000.00

Payoff to Bankruptcy Estate for 506(c) expenses
TOTAL $20,330.18
506(c) expenses                                                 20,330.18

**ADDITIONAL ESCROW AND TITLE CHARGES**

|  | BORROWER | SELLER |
|---|---|---|
| Processing Demands & HOA $50 each to Encore Escrow Company, Inc. |  | 100.00 |
| Drawing Grant Deed to Encore Escrow Company, Inc. |  | 50.00 |
| Handling & Storage Fee to Encore Escrow Company, Inc. |  | 65.00 |
| Total to line 1113 |  | 215.00 |

**ADDITIONAL SETTLEMENT CHARGES**

|  | BORROWER | SELLER |
|---|---|---|
| Transfer Fee to Malibu La Costa HOA |  | 200.00 |
| Estimate for Past due assessments to Malibu La Costa HOA |  | 7,561.53 |
| Total to line 1307 |  | 7,761.53 |

Certified to be a
true & correct copy
of the original

X_____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

U.S. Bank Tower, 633 West 5th Street, Suite 2600, Los Angeles, CA 9007

A true and correct copy of the foregoing document entitled (*specify*):

**MOTION FOR ORDER AUTHORIZING TRUSTEE TO SELL REAL PROPERTY FREE AND CLEAR OF LIENS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF NANCY HOFFMEIER ZAMORA**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 24, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

United States Trustee: United States Trustee (SV), ustpregion16.wh.ecf@usdoj.gov
Trustee: Nancy Zamora, zamora3@aol.com, nzamora@ecf.epiqsystems.com
Creditors' Counsel: Mark Andrews, Sandra.g.cmcmasters@wellsfargo.com, , John D. Schlotter, ecfmail@aclawllp.com,
Secured Creditor's Counsel: Jennifer Witherell Crastz, jcrastz@hemar-rousso.com
☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On July 24, 2014, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor: Fay A. Sagati, 7044 Dume Drive, Malibu, CA  90265
Trustee's CPA: Samuel R. Biggs, CPA, Biggs & Co., 3250 Ocean Park Boulevard, Suite 350, Santa Monica, CA 90405
Trustee's & Buyer's Broker: Behnaz Tavakoli, Rodeo Realty, Inc., 23901Calabasas Road, Suite 1050 Calabasas, CA 91302
Buyer: Vahid Osman, M.D. , 3842 Caerhays CT, Carmel, IN  46032
Escrow: Jenica Pivnik, Encore Escrow, 23901 Calabasas Road, #1033, Calabasas, CA  91302
HOA: Lori Woodruff, Malibu La Costa Owners Association, P.O. Box 1134, Malibu, CA  90265;
Secured Creditor: Sheila Rodriguez, Penny Mac, Property Resolutions, 6101 Condor Drive, Moorpark, CA  93021
U.S Trustee: Kate Bunker, Esq., Office of the United States Trustee, 915 Wilshire Blvd., Suite 1850, Los Angeles, CA  90017
Judge: The Honorable Maureen Tighe, U.S. Bankruptcy Court, 21041 Burbank Boulevard, Suite 324, Woodland Hills, CA 91367

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 24, 2014, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| July 24, 2014 | Cynthia Casas | /s/ Cynthia Casas |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.